[No. G044059. Fourth Dist., Div. Three. June 30, 2011.]

SOUTH ORANGE COUNTY WASTEWATER AUTHORITY, Plaintiff and Appellant, v.
CITY OF DANA POINT, Defendant and Respondent;
MAKAR PROPERTIES, LLC, Real Party in Interest and Respondent.

1606

COUNSEL

Bowie, Arneson, Wiles & Giannone, Wendy H. Wiles and Jeffrey A. Hoskinson for Plaintiff and Appellant.

Rutan & Tucker, Robert S. Bower and John A. Ramirez for Defendant and Respondent.

Richards, Watson & Gershon, Steven H. Kaufmann and Ginetta L. Giovinco for Real Party in Interest and Respondent.

OPINION

**BEDSWORTH, J.—**

## INTRODUCTION

We confront here the converse of our usual California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) issue. Here, we are asked to order an environmental impact report, not to assess the impact of a proposed project on the present environment, but to assess the impact of the present environment upon a proposed project. The argument is that the environment needs to be cleaned up to make it suitable for the project, rather than vice versa.

Petitioner South Orange County Wastewater Authority (SOCWA) appeals from a judgment of the superior court denying its petition for a writ of mandate. SOCWA wanted the City of Dana Point (City) to prepare an environmental impact report (EIR) for a project to develop property next door to a sewage treatment plant SOCWA operates in Dana Point. We find that under CEQA, the project would not have the environmental impact necessary to require an EIR.

SOCWA also contends the land use amendment paving the way for this development made the City's general plan internally inconsistent. The trial court did not address this precise issue, probably because of the unusual manner in which SOCWA presented it. We find no inconsistency. The trial court properly denied SOCWA's petition.

## FACTS

SOCWA operates a sewage treatment plant near the shoreline at Dana Point. In 2007, the City received an application from a developer, Makar Properties, LLC (Makar), to change the City's land use so that eventually Makar could develop a nine-acre site adjacent to SOCWA's plant. As relevant to this appeal, the three components of Makar's application were (1) amending the City's general plan, to create a new, mixed-use land use designation; (2) adding to the City's zoning code a new zone, R/C-22, allowing mixed residential and commercial development; and (3) rezoning the Makar site under the new zone.[1] The City's approval of these changes was only the first step, however. Because of the site's proximity to the shore, the California Coastal Commission would also have to sign off before anything could actually be constructed.

The City's planning commission (Commission) staff began the environmental review process required by CEQA whenever a public agency receives an application to approve a project.[2] It determined the land use changes Makar sought qualified as a project and then conducted an initial study to ascertain whether the project could have a significant adverse effect on the environment. There is no dispute that all of the necessary formalities were observed regarding notices, reviews, and public meetings. Having determined that any environmental effects caused by the project could be mitigated so as to render them insignificant, the Commission issued a mitigated negative declaration (MND) in February 2008. The MND was revised and reissued in October 2008, after the staff analyzed the effects of development more thoroughly.

---

[1] Although the property was zoned coastal recreational by the California Coastal Commission, it had contained a mobilehome park since the 1960's and was zoned by the City in 1991 as commercial/residential. It had not been used for recreation during that time. The new zone Makar wanted the City to create permitted mixed use that was more heavily residential than the mixed-used zones already part of the general plan.

Makar's application included a request to amend the local coastal plan as well, but that amendment is not part of the appeal.

[2] A CEQA "project" as it pertains to the Makar application is "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and that is . . . [¶] . . . [¶] . . . [a]n activity involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Cal. Code Regs., tit. 14, § 15378, subd. (a)(3).)

The Commission held four public hearings on the proposed zoning changes in general and the Makar rezoning in particular, including one site visit open to the public.[3] The City ultimately amended the general plan, approved zoning changes (although not the ones Makar had initially requested), adopted the MND, and passed a resolution requesting California Coastal Commission certification.

SOCWA objected throughout this process. Its initial objections, lodged by letter in March 2008, were based on noise and bad smells from plant operations and water runoff from the property.[4] The runoff issue was dealt with in the course of the review process. That left the noises and the bad smells. Although the smells would be, according to SOCWA, "intermittent" and "fleeting," it still professed to worry that prospective residents of the Makar site would be subjected to them.

While this concern on SOCWA's part for the comfort of residents of a project that was as yet but a gleam in the developer's eye appears to be quite public spirited, in reality SOCWA had a not-so-very-carefully concealed agenda. Its recommended method of dealing with the bad smells— "intermittent" and "fleeting" though they were represented to be—was to cover the plant's aeration tanks, at Makar's expense. The price tag was initially $8 million, later reduced to $4.6 million.[5]

At the Commission's public meetings regarding the land use and zoning changes, the effects of the rezoning were thoroughly discussed. For example, the Commission was not satisfied that the initial traffic studies for the Makar site reflected the realities of a summer weekend in Dana Point and required a do-over. Various limits on the maximum number of residential units per acre and the area to be devoted to commercial space were debated, as well as the odor issue. The Commission ultimately refused to recommend covering the

---

[3] One of the most common objections voiced at these meetings was the lack of a specific project for the Makar site, which the objectors regarded as seeking approval of a pig in a poke. Makar explained that it was not possible to present a specific project until all the steps required to approve the land use change had been taken, including California Coastal Commission approval. Until Makar knew what the zoning parameters were going to be—density, height limits, mix of commercial and residential, etc.—it was simply a waste of money to design a specific project. And even after the City had set all of these parameters, the California Coastal Commission could still alter them before it gave its approval. The California Coastal Commission could also simply refuse to approve any changes at all, in effect killing the project.

[4] SOCWA had a deal with the owner of the mobilehome park to accept water runoff from the park onto plant property. It said it would no longer be willing to do this after the park property changed hands.

[5] SOCWA also wanted an odor easement signed by each property owner and recorded with the property deeds and a buffer zone and visual screening between houses on the property and the plant. SOCWA also suggested installing nonopening windows on buildings near the plant.

tanks as a mitigation measure and recommended approval of the land use changes and the MND without the more onerous odor-related measures sought by SOCWA.[6] The amendment to the general plan creating a new mixed-use designation, the new zoning category (R/C-18), and the change in the zoning of the Makar site were all approved by the city council on June 8, 2009.[7] The specifics of the new R/C-18 zoning category were approved on July 27, 2009. The city council also reviewed and adopted the MND on the same date.

SOCWA then petitioned the superior court for a writ of mandate. SOCWA asserted that a full-scale EIR was required, not just a negative declaration, in order to address the odor issue.[8] SOCWA also alleged the amendment to the general plan rendered the land use elements of the general plan internally inconsistent.

The trial court denied the writ petition. The court pointed out that the CEQA project under review was not the construction of any residences or commercial buildings but rather the change in the City's land use. The City had evaluated the *possible* environmental effects of rezoning the Makar site at the levels permitted in the resolutions.[9] Although not required by CEQA to do so, it had taken into account the possible effects of the proximity of the SOCWA sewage plant, by requiring a buffer zone between the plant and future structures, visual screening, air-conditioning, and notifications in escrow instructions. The court also found the City had properly exercised its discretion with respect to the adoption of the new zoning description and this new zone was not inconsistent with the City's general plan. The court observed that (1) the California Coastal Commission had not yet approved the City's resolutions and (2) the developer had not yet submitted specific plans for the site for review. SOCWA's objections to the project as inconsistent with the general plan were thus premature. The court issued a statement of decision on June 14, 2010.

SOCWA now appeals from the final judgment denying its petition for writ of mandamus.

---

[6] The Commission recommended a buffer zone, a notice about odor in the escrow instructions, and air-conditioning in all buildings as measures to mitigate proximity to the sewage plant. It also recommended visual screening, which, of course, would have no effect on odors.

[7] The city council also passed a separate resolution on June 8 asking for California Coastal Commission approval of the changes in the local coastal program, redesignating the Makar site.

[8] Although SOCWA's petition identified both noise and odor as issues requiring an EIR, by the time it prepared its trial brief, it focused solely on odor.

[9] Makar had originally asked for a zoning description allowing 22 dwelling units per acre and 38,000 square feet of commercial space. The Commission ultimately recommended approval of 18 dwelling units per acre and 20,000 square feet of commercial space.

## DISCUSSION

I. *CEQA Standard of Review and Burden of Proof*

■ CEQA does not purport to approve or disapprove environmentally related activities. Instead, it sets up a process for public agencies to follow whenever an activity they undertake or regulate may affect the environment. (See *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 [253 Cal.Rptr.3d 426, 764 P.2d 278].) This process relies heavily on the collection and dissemination of information regarding possible environmental consequences and on the ability of interested parties—especially the public—to participate in making decisions. (*Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 936 [231 Cal.Rptr. 748, 727 P.2d 1029].) What this means for the courts is that we do not decide whether something is good or bad for the environment—which we are ill equipped to do. (*Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at p. 393.) Instead, courts determine whether the public agency passing judgment on the project followed the CEQA process.

Under Public Resources Code[10] section 21168.5, a court's review of an agency's environmental findings, determinations, or decisions is restricted to whether the agency acted as required by law or to whether substantial evidence supported the determination or decision. "An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 [53 Cal.Rptr.3d 821, 150 P.3d 709].) "[I]n reviewing the adoption of a negative declaration, the concern of both trial courts and appellate courts 'is whether there is substantial evidence in the record supporting a fair argument of significant environmental impact.' [Citations.]" (*Architectural Heritage Assn. v. County of Monterey* (2004) 122 Cal.App.4th 1095, 1109 [19 Cal.Rptr.3d 469].)

SOCWA bears the burden of proof to demonstrate, by citation to the administrative record, the existence of substantial evidence supporting a fair argument of significant environmental impact. (*League for Protection of Oakland's etc. Historic Resources v. City of Oakland* (1997) 52 Cal.App.4th 896, 904 [60 Cal.Rptr.2d 821]; see also § 21080, subd. (c)(2).) Unless the

---

[10] All further statutory references are to the Public Resources Code, unless otherwise indicated.

administrative record contains this evidence, and SOCWA cites to it, no "fair argument" that an EIR is necessary can be made. (*Cathay Mortuary, Inc. v. San Francisco Planning Com.* (1989) 207 Cal.App.3d 275, 278 [254 Cal.Rptr. 778].) SOCWA has restricted the "impact" at issue in this appeal to odors from the sewage plant.

## II. *Purpose of CEQA Review of Land Use Projects*

The key CEQA issue in this appeal is whether an EIR was required on the impact of odors from SOCWA's sewage plant on the land use changes sought by Makar. It is important to pinpoint the component of the Makar project that required consideration of an EIR. The only component that could even arguably have had an immediate impact on the environment was the rezoning of the Makar site from coastal recreation to R/C-18. We hold that no EIR was necessary for this component, basing our holding on both the legislative intent and the unambiguous statutory language used to carry out this intent.

When the Legislature enacted the CEQA in 1970, it stated the act's purpose in unmistakable terms. "The maintenance of a quality environment for the people of this state now and in the future is a matter of statewide concern." (§ 21000, subd. (a).) "Every citizen has a responsibility to contribute to the preservation and enhancement of the environment." (*Id.*, subd. (e).) "It is the intent of the Legislature that all agencies of the state government which regulate activities of private individuals, corporations, and public agencies which are found to affect the quality of the environment, shall regulate such activities so that major consideration is given to preventing environmental damage, while providing a decent home and satisfying living environment for every Californian." (*Id.*, subd. (g).) To be sure the message got across, the Legislature enacted an "additional legislative intent" section, which included "[d]evelop and maintain a high-quality environment now and in the future, and take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state," and "[e]nsure that the long-term protection of the environment, consistent with the provision of a decent home and suitable living environment for every Californian, shall be the guiding criterion in public decisions," and "[r]equire governmental agencies at all levels to develop standards and procedures necessary to protect environmental quality." (§ 21001, subds. (a), (d), (f).)

■ From the earliest CEQA cases, the courts have interpreted the act to realize the Legislature's intent. (See, e.g., *Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049] ["Legislature intended the [C]EQA to be interpreted in such manner as to afford the fullest possible protection to the environment . . . ."], disapproved on other grounds in *Kowis v. Howard* (1992) 3 Cal.4th 888 [12 Cal.Rptr.2d

728, 838 P.2d 250]; *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 276 [118 Cal.Rptr. 249, 529 P.2d 1017]; *Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn., supra,* 42 Cal.3d at p. 939.) At the same time, courts have recognized that CEQA is not a weapon to be deployed against all possible development ills. For example, although CEQA requires public agencies to evaluate the possible negative environmental effects of constructing big-box retail stores (e.g., air pollution from traffic, noise and light pollution, destruction of open space), the fact that they may drive smaller retailers out of business is not an effect covered by CEQA. (See *Waste Management of Alameda County, Inc. v. County of Alameda* (2000) 79 Cal.App.4th 1223, 1235 [94 Cal.Rptr.2d 740] [CEQA not intended to protect competition among commercial enterprises].) Only if the loss of businesses affects the physical environment—for example, by causing or increasing urban decay—will CEQA be engaged. (See *Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1182 [30 Cal.Rptr.3d 738]; *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1205–1206 [22 Cal.Rptr.3d 203]; *Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1019–1020 [100 Cal.Rptr.2d 413]; *Citizens for Quality Growth v. City of Mt. Shasta* (1988) 198 Cal.App.3d 433, 446 [243 Cal.Rptr. 727]; Cal. Code Regs., tit. 14, § 15064, subd. (e) [economic changes significant only if they cause physical change to environment].)

■ CEQA defines "environment" as "the physical conditions which exist within the area which will be *affected by a proposed project,* including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (§ 21060.5, italics added.) An EIR is required on any project that "may have a significant effect on the environment." (§§ 21100, subd. (a), 21101, 21151, subd. (a).) A " '[s]ignificant effect on the environment' means a substantial, or potentially substantial, *adverse change in any of the physical conditions* within the area affected by the project . . . ." (Cal. Code Regs., tit. 14, § 15382, italics added.)

SOCWA's objection to the adoption of MND for the rezoning essentially turns CEQA upside down. Instead of using the act to defend the existing environment from adverse changes caused by a proposed project, SOCWA wants to use the act to defend the proposed project (the future residences) from a purportedly adverse existing environment (smells from the sewage treatment plant). In actuality, of course, SOCWA wants to protect itself from nuisance complaints by potential neighbors based on bad smells from the plant, while sticking Makar with the bill.[11] The statutory definition of

---

[11] This underlying purpose was not lost on the Commission. As one commissioner stated, "[SOCWA] seemed to be of the opinion that if they just hold firm they can extract $8 million from Makar." The City's attorney explained to the Commission why this extraction would not work under CEQA.

"environment"—"the physical conditions . . . which will be affected by a proposed project" (§ 21060.5)—precludes any such application of CEQA.

*Baird v. County of Contra Costa* (1995) 32 Cal.App.4th 1464 [38 Cal.Rptr. 2d 93] (*Baird*), on which the trial court relied, correctly dealt with this exact situation. In *Baird*, some neighbors of an addiction treatment facility opposed an expansion of the facility to treat young drug addicts and alcoholics. (*Id.* at p. 1466.) They professed to be concerned about the environmental impact of the project—not the impact of the project on the environment, however, but rather the impact of the environment on the project and its future drug-addict and alcoholic residents. The neighbors claimed that the proposed site was contaminated by oil, mercury, wastewater, and sewage, all of which would harm the future residents. (*Ibid.*) An EIR was therefore required. The county disagreed and approved the permit for the expansion, issuing a negative declaration that the project would not have a significant effect on the environment. (*Id.* at p. 1467.) The neighbors sued and got the trial court to agree with them about the EIR.

The appellate court reversed. "To require an EIR in the present context, where the proposed project is challenged on the basis of preexisting environmental conditions rather than an adverse change in the environment, would impose a requirement beyond those stated in CEQA or its guidelines, and is thus prohibited." (*Baird, supra*, 32 Cal.App.4th at p. 1469.) An EIR is required "if substantial evidence supports a fair argument that the project may have a significant effect on the environment." (*Id.* at p. 1468.) " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." (§ 21068.) Because the expansion project contemplated no change at all in the environment (the physical conditions affected by the proposed project), no EIR was necessary. (*Baird, supra*, 32 Cal.App.4th at p. 1469; see also *City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 905 [98 Cal.Rptr.3d 137] [purpose of EIR to identify effects of project on environment, not effects of environment on project].)

This case presents the same issue. The Makar rezoning contemplated no changes in the sewage plant or in its odor-producing operations. An EIR was not required for the zoning change because the initial study turned up no significant and irreversible adverse environmental effects; the environmental effects the study did identify could be mitigated. One purpose of an initial study is to "[e]liminate unnecessary EIRs." (Cal. Code Regs., tit. 14, § 15063, subd. (c)(6).)

"The purpose of an [EIR] is to provide public agencies and the public in general with detailed information about the *effect which a proposed project in*

*likely to have on the environment . . . .*" (§ 21061, italics added.) SOCWA has identified no effect on the environment attributable to the rezoning that would justify an EIR. (Cf. *Silveira v. Las Gallinas Valley Sanitary Dist.* (1997) 54 Cal.App.4th 980, 994 [63 Cal.Rptr.2d 244] [no EIR necessary if no environmental impacts].)

SOCWA has not cited any cases in which the environment's effect on a project was held to require an EIR. Likewise, it has not given us any statutory authority for extending the EIR requirement to situations where the environment has an effect on a project, instead of the other way around. SOCWA refers to an appendix to the CEQA guidelines, appendix G, which is a sample checklist form that is *suggested* for use in preparing an initial study. (See Cal. Code Regs., tit. 14, § 15063, subd. (f).) A few questions in the nine-page checklist deal with exposure of people to environmental hazards. ("Would the project . . . [¶] . . . [¶] . . . [e]xpose people or structures to a significant risk of loss, injury, or death involving wildland fires . . . ?") A few questions on a suggested checklist in an appendix to the guidelines do not seem to us to provide a strong enough foundation on which to base a reversal of the entire purpose of CEQA.

SOCWA also refers to one of the guidelines, California Code of Regulations, title 14, section 15126.2, entitled "Consideration and Discussion of Significant Environmental Impacts," which deals with the content of an EIR. Subdivision (a) states, in part, "The EIR shall also analyze any significant environmental effects the project might cause by bringing development and people into the area affected. For example, an EIR on a subdivision astride an active fault line should identify as a significant effect the seismic hazard to future occupants of the subdivision. The subdivision would have the effect of attracting people to the location and exposing them to the hazards found there. Similarly, the EIR should evaluate any potentially significant impacts of locating development in other areas susceptible to hazardous conditions (e.g., floodplains, coastlines, wildfire risk areas) . . . ."

██ While identifying the environmental effects of attracting people to an area certainly comports with CEQA's legislative intent and statutory framework, we cannot help but notice that the "examples" given in subdivision (a) of California Code of Regulations, title 14, section 15126.2 are not examples of environmental effects wrought by development. A true example with respect to, say, wildfires would be increasing the risk in a fire-prone area by people using their fireplaces or their backyard barbeques or by children playing with matches. The guidelines are entitled to great weight, except when they are inconsistent with controlling law. (*Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at p. 391, fn. 2; *Communities for a Better Environment v. California Resources Agency* (2002)

103 Cal.App.4th 98, 109–110 [126 Cal.Rptr.2d 441]; see also *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1218–1219 [61 Cal.Rptr.2d 447] [guidelines invalid if they exceed statutory scope].) We should also point out that the guideline deals with the content of an EIR after it has been determined one is necessary. It does not address the question at issue here: whether an EIR is necessary at all.

◾ The Legislature has expressly forbidden courts to interpret CEQA or the regulatory guidelines to impose "procedural or substantive requirements beyond those explicitly stated" in the act or in the guidelines. (§ 21083.1; see also *Sunset Sky Ranch Pilots Assn. v. County of Sacramento* (2009) 47 Cal.4th 902, 907 [102 Cal.Rptr.3d 894, 220 P.3d 905] [Legislature limited CEQA's scope].) This prohibition would encompass expanding CEQA to cover situations in which the project, not the environment, is alleged to be at risk.

SOCWA also criticizes the City for dealing only with the zoning changes instead of the entire future development (the construction of residences and commercial space), citing cases holding that CEQA does not allow a project to be approved piecemeal, because doing so could mask the cumulative effects of environmental change. (See, e.g., *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 619–620 [91 Cal.Rptr.3d 571]; *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 165 [217 Cal.Rptr. 893]; § 21083, subd. (b)(2).) This principle certainly holds true for projects that actually affect the environment. Chopping them up into small pieces, each of which would have only a small environmental impact, could result in quite large adverse effects at the end of the entire process. (See, e.g., *Communities for a Better Environment v. California Resources Agency, supra*, 103 Cal.App.4th at p. 114; *Plan for Arcadia, Inc. v. City Council of Arcadia* (1974) 42 Cal.App.3d 712, 726 [117 Cal.Rptr. 96].) But these cases do not apply to this situation. The odors from the sewage plant are what they are. Whether the Makar project proceeds in one phase or in a hundred phases will not affect what emanates from the plant. Because SOCWA is trying to make CEQA work in reverse, the cases about the cumulative effects of multiple small environmental changes are inapposite.

◾ The Legislature did not enact CEQA to protect people from the environment. Other statutes, ordinances, and regulations fulfill that function. (See, e.g., Health & Saf. Code, § 25220 et seq. [location of residences near hazardous waste site]; Pub. Resources Code, § 2621.5 et seq. [location of structures near earthquake faults]; Wat. Code, § 8410, subd. (a) [construction of structures in floodways]; *Silveira v. Las Gallinas Valley Sanitary Dist., supra*, 54 Cal.App.4th at p. 990 [Bay Area Air Quality Management District's

regulation regarding residential construction near waste treatment plant].) The South Coast Air Quality Management District regulates SOCWA's operations (see Health & Saf. Code, §§ 40440, 40460), and regulation of odor emissions forms part of the district's oversight of air pollution. (*Id.*, § 39013.) This is the framework established by the Legislature to protect people from odors such as the ones SOCWA's sewage plant might produce. CEQA serves another purpose.

■ The City acted as required by law. It examined the Makar application to alter the City's general plan, to create a new zoning description, and to apply the new description to Makar's property to see whether approving the application would have "a 'significant effect on the environment.' " (§ 21083, subd. (b).) The effect with which SOCWA is concerned—odors from the sewage plant—is not an adverse change in any of the physical conditions within the area affected by the Makar project. (See Cal. Code Regs., tit. 14, § 15382.) An EIR was therefore unnecessary with respect to these odors.

## III. *Consistency with General Plan*

■ All cities and counties must adopt comprehensive, long-term general plans for physical development. (Gov. Code, § 65300.) Government Code section 65300.5 requires that a "general plan and [the] elements and parts thereof comprise an integrated, internally consistent and compatible statement of policies for the adopting agency." Subsequent land use decisions must be consistent with the general plan and its elements. (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782 [32 Cal.Rptr.3d 177].) A general plan must include a land use element, which "designates the proposed general distribution and general location and extent of the uses of the land for housing, business, industry, open space, including agriculture, natural resources, recreation, . . . and liquid waste disposal facilities, and other categories of public and private uses of land. . . . The land use element shall include a statement of the standards of population density and building intensity recommended for the various districts and other territory covered by the plan. . . ." (Gov. Code, § 65302, subd. (a).) Government Code section 65358 permits a legislative body to amend "all or part of an adopted general plan" when amendment is "in the public interest." (*Id.*, subd. (a).)

### A. *Internal Consistency of General Plan*

Although it is not entirely clear, SOCWA appears to be arguing—at least at one point—that the City improperly amended its general plan to include a new land use designation, "Residential/Commercial." According to SOCWA, the amendment created an internally inconsistent general plan, specifically an internally inconsistent land use element in the general plan.

 "The adoption or amendment of a general plan is a legislative act. [Citation.] A legislative act is presumed valid, and a city need not make explicit findings to support its action. [Citations.] A court cannot inquire into the wisdom of a legislative act or review the merits of a local government's policy decisions. [Citation.] Judicial review of a legislative act under Code of Civil Procedure section 1085 is limited to determining whether the public agency's action was arbitrary, capricious, entirely without evidentiary support, or procedurally unfair. [Citations.] A court therefore cannot disturb a general plan based on violation of the internal consistency and correlation requirements unless, based on the evidence before the city council, a reasonable person could not conclude that the plan is internally consistent or correlative. [Citation.]" (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1195 [24 Cal.Rptr.3d 543].) SOCWA has the burden of proof to demonstrate that the amendment to the general plan rendered the plan internally inconsistent. (See *Garat v. City of Riverside* (1991) 2 Cal.App.4th 259, 293 [3 Cal.Rptr.2d 504], disapproved on other grounds in *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725 [29 Cal.Rptr.2d 804, 872 P.2d 143].)

A general plan is internally inconsistent when one required element impedes or frustrates another element or when one part of an element contradicts another part of the same element. For example, a land use element calling for substantial increases in population is inconsistent with a circulation element acknowledging that existing roads are inadequate to handle more traffic and offering no practical way to obtain better roads. (See *Concerned Citizens of Calaveras County v. Board of Supervisors* (1985) 166 Cal.App.3d 90, 103 [212 Cal.Rptr. 273].) Likewise a circulation element suggesting in one section that the existing road system is adequate for the long term but admitting in another section that the roads cannot handle projected increased future traffic is internally inconsistent. (*Id.* at p. 98.)

Nothing in this record supports the idea that amending the City's general plan by adding another mixed-use land designation made the plan internally inconsistent. The City's general plan already had two mixed-use designations, "Commercial/Residential" and "Professional/Residential."[12] These designations, however, focused on commercial or office development and limited residential development to 10 dwelling units per acre of land. The Commercial/Residential designation permitted "mixtures of commercial, office and residential uses in the same building, on the same parcel, or within

---

[12] The general plan included in the record designates only "Commercial/Residential" as a mixed-use designation. This version of the general plan is, however, dated 1995; evidently some changes were made after that. A Commission staff member discussed the additional mixed-use designation, Professional/Residential, at the February 2009 Commission public meeting. This designation was also limited to 10 dwelling units per acre.

the same area." The Makar amendment added a new designation, "Residential/ Commercial," which also provided for "a mixture of residential, commercial, and office uses in the same building, or on the same parcel." The new designation allowed a higher residential density (18 units per acre) and more limited commercial development. The new designation also required a certain percentage of the units to qualify as affordable housing.

The new designation helps to fulfill the City's first land use goal, "Achieving a balanced mixture of residential, commercial, industrial, and other land uses," and the following policies developed to realize this goal: "Policy 1.1: Develop standards for building intensity, including standards for ground coverage, setbacks, open space/landscaping, maximum dwellings per acre, floor area ratios, size and height restrictions. [¶] Policy 1.2: Establish maximum intensities of development for each of the various land use categories." (Boldface omitted.) "With the addition of the new zone," explained a Commission staff member, "the City will have a full range of mixed use Zoning districts."

SOCWA claims that the amendment is inconsistent with the general plan because it "includes no mechanism or provision for ensuring that commercial and residential components, placed within the mixed use area, are both internally compatible and compatible with surrounding land uses."[13] This argument misconceives the amendment's purpose. It is intended to add a designation or general description of land use, like "Residential 0-3.5," "Neighborhood Commercial," "Industrial/Business Park," or "Open Space," to the designations already in the plan. It is not intended or required to provide any "mechanism" or "provision" for insuring compatibility, any more than the other land use designations were. They are, like the one added by the amendment, simply broad-brush descriptions of the kind of development that can and cannot take place within each designation.

### B. Consistency of General Plan and New Zoning Ordinance

SOCWA also argues that the adoption of "the Project" resulted "in an inconsistent General Plan," because it did not properly take into account odors from the sewage plant. The "project" is broader than simply amending

---

[13] SOCWA bases the necessity for this mechanism on the general plan's second land use goal, "Achieving compatibility and enhancement among various land use types." The policy under this second goal that applies to the issue before us is policy 2.1: "Consider the impacts on surrounding land uses and infrastructure when reviewing proposals for new development." Amending the general plan to include a new land use designation does not impede or frustrate the goal of achieving compatibility among various land uses or preclude considering the impacts of new development on surrounding land and infrastructure. "It is the *policies* which must be integrated, internally consistent and compatible, . . . not . . . the objectives within the various elements." (*Garat v. City of Riverside, supra,* 2 Cal.App.4th at p. 300.)

the general plan; it encompasses adding a zoning ordinance to the Dana Point Municipal Code and rezoning the Makar site as R/C-18. Because SOCWA is so vague about defining what part of "the Project" it is referring to, it is difficult to tell exactly what its argument is.

If SOCWA is arguing that the adoption of the R/C-18 zoning ordinance would make the general plan inconsistent, it is incorrect. Specific zoning is not part of the general plan. It is covered in the Dana Point Municipal Code. A zoning ordinance must be consistent with a general plan (Gov. Code, § 65860, subd. (a)), and must be "compatible with the objectives, policies, general land uses, and programs specified in the plan." (*Id.*, subd. (a)(2).) "A zoning ordinance is consistent with the city's general plan where, considering all of its aspects, the ordinance furthers the objectives and policies of the general plan and does not obstruct their attainment." (*City of Irvine v. Irvine Citizens Against Overdevelopment* (1994) 25 Cal.App.4th 868, 879 [30 Cal.Rptr.2d 797].) Thus, a zoning ordinance must be consistent with the general plan, but its failure to be consistent does not render the general plan itself inconsistent.

A zoning ordinance is a template for development. As the Commission was repeatedly informed, and obviously grasped, anyone who wanted to develop an area with primarily residential mixed-use construction would apply to have the area zoned R/C-18. (Actual construction would, of course, have to be separately approved.) Being located next door to a sewage treatment plant was not an inevitable feature of R/C-18 development. The ordinance adding the R/C-18 zoning category therefore did not have to specify mitigation measures for this unique situation. SOCWA points to nothing that would make the ordinance inconsistent with the City's general plan. And enacting the ordinance could not possibly make the general plan internally inconsistent.

### C. *Consistency of General Plan and Makar Site Zoning*

SOCWA also appears to be arguing that rezoning of the Makar site, with the mitigation measures included in the MND, created an internally inconsistent general plan. This is not possible. The rezoning forms no part of the general plan. It is a specific decision made for a specific site. An internal inconsistency must be between or among elements of the general plan itself (*Federation of Hillside & Canyon Assns. v. City of Los Angeles, supra,* 126 Cal.App.4th at p. 1195), not between the general plan and the application of a zoning ordinance.

## DISPOSITION

The judgment is affirmed. Appellant's request for judicial notice filed January 19, 2011, is denied. Respondents are to recover their costs on appeal.

Rylaarsdam, Acting P. J., and Moore, J., concurrred.