[No. B231965. Second Dist., Div. Three. Nov. 9, 2011.]

BALLONA WETLANDS LAND TRUST et al., Plaintiffs and Appellants, v. CITY OF LOS ANGELES, Defendant and Respondent; PLAYA CAPITAL COMPANY, LLC, Real Party in Interest and Respondent. BALLONA ECOSYSTEM EDUCATION PROJECT, Plaintiff and Appellant, v. CITY OF LOS ANGELES, Defendant and Respondent; PLAYA CAPITAL COMPANY, LLC, Real Party in Interest and Respondent.

458

**Counsel**

Venskus & Associates, Sabrina Venskus and Emilee Moeller for Plaintiffs and Appellants Ballona Wetlands Land Trust, Anthony Morales and Surfrider Foundation.

Law Office of Brian Acree and Brian Acree for Plaintiff and Appellant Ballona Ecosystem Education Project.

Carmen A. Trutanich, City Attorney, and Siegmund Shyu, Deputy City Attorney, for Defendant and Respondent.

Alston & Bird, Edward J. Casey, Robert D. Pontelle and Neal P. Maguire for Real Party in Interest and Respondent.

OPINION

CROSKEY, J.—Ballona Wetlands Land Trust, Anthony Morales and Surfrider Foundation (collectively Ballona Wetlands) and Ballona Ecosystem Education Project (BEEP) challenge the certification by the City of Los Angeles (City) of a revised environmental impact report (EIR) for the Playa Vista phase two project. Playa Capital Company, LLC (Playa Capital), is the developer. The City revised the EIR in response to a peremptory writ of mandate issued by the trial court at our direction. The writ directed the City to vacate its project approvals and EIR certification and to revise certain parts of the EIR.

Ballona Wetlands and BEEP challenge the revised EIR with respect to the project description, the analysis of archaeological resources and sea level rise resulting from global climate change, and the finding of no significant impact on land use consistency. They also challenge an award of costs to the City and Playa Capital as prevailing parties.

We conclude that the revised EIR adequately discusses preservation in place and the impacts of sea level rise resulting from global climate change. We also conclude that BEEP's newly asserted challenges to the project description and the finding on land use consistency are beyond the scope of the trial court's jurisdiction in these consolidated proceedings after the entry of judgment and issuance of a peremptory writ of mandate. We conclude further that the City and Playa Capital as prevailing parties on the petition for writ of mandate filed by BEEP in May 2010 are entitled to recover their costs in that proceeding. We therefore will affirm the judgment and order.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Prior Approval of the Playa Vista Phase Two Project*

The Playa Vista phase two project is a proposed mixed-use real estate development adjacent to the previously approved and largely constructed Playa Vista phase one project. The phase two project is described more particularly in our prior opinion in *City of Santa Monica v. City of Los Angeles* (*Playa Capital Company, LLC*) (Sept. 13, 2007, B189630) (nonpub. opn.).

The City completed a final EIR for the phase two project in April 2004. The City certified the EIR, adopted findings under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) and a statement of overriding considerations, and approved the project in September 2004. The project approvals included the approval of a vesting tentative map, adoption of

a resolution amending the general plan, adoption of ordinances amending the specific plan, and adoption of an ordinance authorizing a development agreement.

### 2. *Petitions for Writ of Mandate and Prior Appeal*

City of Santa Monica, Ballona Wetlands Land Trust, Anthony Morales and Surfrider Foundation filed a petition for writ of mandate in November 2004 challenging the City's certification of the EIR and approval of the phase two project (*City of Santa Monica v. City of Los Angeles* (Super. Ct. L.A. County, 2008, No. BS093502)). Federation of Hillside and Canyon Associations, BEEP and others filed a separate petition for writ of mandate in November 2004 challenging the certification of the EIR and project approval (*Federation of Hillside v. City of Los Angeles* (Super. Ct. L.A. County, 2006, No. BS093507)). The trial court consolidated the two proceedings. After a hearing on the merits, the court issued a statement of decision and entered a judgment denying the petitions in January 2006.

On appeal, we rejected several challenges to the adequacy of the EIR and the City's CEQA findings. We concluded, however, that (1) the land use analysis in the EIR was materially misleading with respect to the effect of the proposed specific plan amendments on the amount of development allowed on the phase two project site; (2) the EIR failed to discuss preservation in place as a means to mitigate the significant effects on historical archaeological resources, as required; and (3) the EIR failed to adequately analyze the project-specific and cumulative wastewater impacts. We therefore reversed the judgment with directions to the trial court to issue a peremptory writ of mandate ordering the City to vacate its certification of the EIR and its project approvals and revise the EIR to remedy these deficiencies. (*City of Santa Monica v. City of Los Angeles (Playa Capital Company, LLC)*, *supra*, B189630.)

The trial court entered a judgment in May 2008 granting the petitions in part and denying them in part, and issued a peremptory writ of mandate consistent with our directions.[1] The judgment awarded costs to the petitioners.

### 3. *Further Environmental Review and Project Approval*

The City accordingly vacated its certification of the EIR and its project approvals. The City revised sections of the EIR discussing impacts relating to land use, archaeological resources and wastewater, and revised the executive

---

[1] We judicially notice the writ of mandate filed on May 27, 2008. (Evid. Code, § 452, subd. (d).)

summary. The City also prepared a new section discussing the impacts of global climate change in light of new legislation concerning the reduction of greenhouse gas emissions. The City circulated the EIR revisions for public comment beginning in January 2009 and prepared written responses to comments.

The City then conducted several hearings on the phase two project and revised EIR, culminating in the city council's certification of the revised EIR and approval of the phase two project in March and April 2010. The city council adopted CEQA findings and a statement of overriding considerations.

### 4. *Discharge of the Writ*

The City filed a supplemental return to the writ of mandate in April 2010 stating that it had complied with the writ by taking the actions described above. BEEP filed a new petition for writ of mandate in May 2010 challenging the project description, analysis of land use impacts, discussion of project alternatives and analysis of global climate change impacts in the revised EIR (Super. Ct. L.A. County, No. BS126281). The trial court ordered the new proceeding consolidated with the pending proceedings.

Ballona Wetlands and BEEP filed objections to the supplemental return. After a hearing on the merits, the superior court overruled the objections and entered a judgment in February 2011 discharging the writ of mandate and denying relief on BEEP's latest petition.[2] The judgment states that the City and Playa Capital are entitled to costs as prevailing parties. Ballona Wetlands and BEEP timely appealed the judgment. We issued an order on May 3, 2011, staying all construction activities on the project involving the disturbance of native soil or soil within known archaeological sites.

### CONTENTIONS

Ballona Wetlands contends (1) the revised EIR fails to adequately discuss preservation in place as a means to mitigate significant impacts on historical archaeological resources; (2) the revised EIR fails to adequately discuss impacts relating to sea level rise as a result of global climate change, and the responses to comments on this subject are inadequate; and (3) the City and

---

[2] Although it is denominated a judgment, we regard the ruling as a postjudgment order with respect to the discharge of the writ and a judgment with respect to the denial of relief on BEEP's latest petition for writ of mandate. After the entry of judgment and issuance of a peremptory writ of mandate, an order concerning compliance with the writ is a postjudgment order and is appealable as an order relating to the enforcement of a judgment. (Code Civ. Proc., § 904.1, subd. (a)(2); *City of Carmel-by-the-Sea v. Board of Supervisors* (1982) 137 Cal.App.3d 964, 971 [187 Cal.Rptr. 379] (*Carmel-by-the-Sea*).)

Playa Capital are not prevailing parties in these proceedings and therefore are not entitled to an award of costs.

BEEP contends (1) the project description in the revised EIR is misleading because it fails to disclose that Playa Capital previously agreed to eliminate land use entitlements that it now seeks to exploit in phase two; (2) the City's finding of no significant impact on land use consistency is contrary to the City's own L.A. CEQA Thresholds Guide (2006) and is not supported by the evidence; and (3) the City and Playa Capital are not prevailing parties in these proceedings and therefore are not entitled to an award of costs.[3]

## *DISCUSSION*

### 1. *CEQA Requirements*

■ "CEQA is a comprehensive scheme designed to provide long-term protection to the environment. [Citation.] In enacting CEQA, the Legislature declared its intention that all public agencies responsible for regulating activities affecting the environment give prime consideration to preventing environmental damage when carrying out their duties. [Citations.] CEQA is to be interpreted 'to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' [Citation.]" (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112 [65 Cal.Rptr.2d 580, 939 P.2d 1280] (*Mountain Lion*).)

■ An EIR is required for any project that a public agency proposes to carry out or approve that may have a significant effect on the environment. (Pub. Resources Code, §§ 21100, subd. (a), 21151, subd. (a); Guidelines, § 15064,[4] subd. (a)(1).) An EIR must describe the proposed project and its environmental setting, state the objectives sought to be achieved, identify and analyze the significant effects on the environment, state how those impacts can be mitigated or avoided, and identify and analyze alternatives to the project, among other requirements. (Pub. Resources Code, §§ 21100, subd. (b), 21151; Guidelines, §§ 15124, 15125, 15126.6.) "The purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project is

---

[3] BEEP also joins in the argument by Ballona Wetlands relating to sea level rise resulting from global climate change.

[4] All references to Guidelines are to the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.) developed by the Office of Planning and Research and adopted by the Resources Agency. (Pub. Resources Code, § 21083; *id.*, former § 21087.) "[C]ourts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights I*).)

likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (Pub. Resources Code, § 21061.)

■ The lead agency must notify the public of the draft EIR, make the draft EIR and all documents referenced in it available for public review, and respond to comments that raise significant environmental issues. (Pub. Resources Code, §§ 21092, 21091, subds. (a), (d); Guidelines, §§ 15087, 15088.) The agency also must consult with and obtain comments from other agencies affected by the project and respond to their comments. (Pub. Resources Code, §§ 21092.5, 21104, 21153; Guidelines, § 15086.) The agency must prepare a final EIR including any revisions to the draft EIR, comments received from the public and from other agencies, and responses to comments. (Guidelines, §§ 15089, subd. (a), 15132.)

■ An agency may not approve a project that will have significant environmental effects if there are feasible alternatives or feasible mitigation measures that would substantially lessen those effects.[5] (Pub. Resources Code, §§ 21002, 21002.1, subd. (b); Guidelines, § 15021, subd. (a)(2); *Mountain Lion, supra*, 16 Cal.4th at p. 134.) An agency may find, however, that particular economic, social, or other considerations make the alternatives and mitigation measures infeasible and that particular project benefits outweigh the adverse environmental effects. (Pub. Resources Code, § 21081, subds. (a)(3), (b); Guidelines, § 15091, subd. (a)(3).) ■ Specifically, an agency cannot approve a project that will have significant environmental effects unless it finds as to each significant effect, based on substantial evidence in the administrative record, that (1) mitigation measures required in or incorporated into the project will avoid or substantially lessen the significant effect; (2) those measures are within the jurisdiction of another public agency and have been adopted, or can and should be adopted, by that agency; or (3) specific economic, legal, social, technological, or other considerations make the mitigation measures or alternatives identified in the EIR infeasible, and specific overriding economic, legal, social, technological, or other benefits outweigh the significant environmental effects. (Pub. Resources Code, §§ 21081, 21081.5; Guidelines, § 15091, subds. (a), (b).) A finding that specific overriding project benefits outweigh the significant environmental effects (Pub. Resources Code, § 21081, subd. (b)) is known as a statement of overriding considerations. (Guidelines, § 15093.)

■ Thus, a public agency is not required to favor environmental protection over other considerations, but it must disclose and carefully consider the

[5] " 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (Pub. Resources Code, § 21061.1; see also Guidelines, § 15364.)

environmental consequences of its actions, mitigate or avoid adverse environmental effects if feasible, explain the reasons for its actions, and afford the public and other affected agencies an opportunity to participate meaningfully in the environmental review process. The purpose of these requirements is to ensure that public officials and the public are aware of the environmental consequences of decisions before they are made. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161] (*Goleta Valley*).) The EIR process also informs the public of the basis for environmentally significant decisions by public officials and thereby promotes accountability and informed self-government. (*Laurel Heights I, supra,* 47 Cal.3d at p. 392; *Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 935–936 [231 Cal.Rptr. 748, 727 P.2d 1029].) Before approving the project, the agency must certify that its decisionmaking body reviewed and considered the information contained in the EIR, that the EIR reflects the agency's independent judgment and analysis, and that the EIR was completed in compliance with CEQA. (Pub. Resources Code, § 21082.1, subd. (c); Guidelines, § 15090.)

■ "We have repeatedly recognized that the EIR is the 'heart of CEQA.' [Citations.] 'Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made. Thus, the EIR "protects not only the environment but also informed self-government." [Citation.]' [Citation.] To this end, public participation is an 'essential part of the CEQA process.' [Citations.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502] (*Laurel Heights II*).) "The preparation and circulation of an EIR is more than a set of technical hurdles for agencies and developers to overcome. The EIR's function is to ensure that government officials who decide to build or approve a project do so with a full understanding of the environmental consequences and, equally important, that the public is assured those consequences have been taken into account. (*Laurel Heights I, supra,* 47 Cal.3d at pp. 391–392.) For the EIR to serve these goals it must present information in such a manner that the foreseeable impacts of pursuing the project can actually be understood and weighed, and the public must be given an adequate opportunity to comment on that presentation before the decision to go forward is made." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 449–450 [53 Cal.Rptr.3d 821, 150 P.3d 709] (*Vineyard Area Citizens*).)

### 2. *Standard of Review*

The standard of review of an agency's decision under CEQA is abuse of discretion. Abuse of discretion means the agency failed to proceed in a

manner required by law or there was no substantial evidence to support its decision. (Pub. Resources Code, §§ 21168, 21168.5; *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 945 [91 Cal.Rptr.2d 66] (*County of Amador*).)

Whether the agency failed to proceed in a manner required by law is a question of law. A court determines de novo whether the agency complied with CEQA's procedural requirements, " 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' (*Citizens of Goleta Valley v. Board of Supervisors*[, *supra*,] 52 Cal.3d 553, 564 . . .)." (*Vineyard Area Citizens, supra,* 40 Cal.4th at p. 435.) The failure to provide information required by CEQA in an EIR is a failure to proceed in a manner required by law. (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 118 [104 Cal.Rptr.2d 326].) The failure to comply with CEQA's procedural or information disclosure requirements is a prejudicial abuse of discretion if the decision makers or the public is deprived of information necessary to make a meaningful assessment of the environmental impacts. (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236–1237 [32 Cal.Rptr.2d 19, 876 P.2d 505]; *County of Amador, supra,* 76 Cal.App.4th at p. 946; see Pub. Resources Code, § 21005.)

Findings of fact made by the agency and factual conclusions stated in an EIR are reviewed under the substantial evidence standard. (*Vineyard Area Citizens, supra,* 40 Cal.4th at p. 435; *Laurel Heights I, supra,* 47 Cal.3d at pp. 392–393, 407.) Under the substantial evidence standard, the court does not determine whether the agency's factual determinations were correct, but only determines whether they were supported by substantial evidence. (*Laurel Heights I, supra,* at pp. 392–393.) On appeal, we independently review the agency's decision under the same standard of review that governs the trial court. (*Vineyard Area Citizens, supra,* at p. 427.)

"[S]ubstantial evidence" under CEQA "includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact." (Pub. Resources Code, § 21080, subd. (e)(1); see also Guidelines, § 15384, subd. (b).) Guidelines section 15384, subdivision (a) defines "substantial evidence" as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." "Substantial evidence is not argument, speculation, unsubstantiated opinion or narrative, evidence that is clearly inaccurate or erroneous, or evidence of social or economic impacts that do not contribute to, or are not caused by, physical impacts on the environment." (Pub. Resources Code, § 21080, subd. (e)(2); see also Guidelines, § 15384, subd. (a).)

### 3. *Archaeological Resources*

The phase two project site contains two archaeological sites known as "CA-LAN-62" and "CA-LAN-211/H." Both sites are traversed by the riparian corridor, and both were identified prior to the preparation of the 2004 EIR. During the construction of the riparian corridor, human remains and other archaeological features were discovered in CA-LAN-211/H. Fewer and less significant artifacts were discovered in CA-LAN-62.

Guidelines section 15126.4, subdivision (b)(3) states that preservation in place is the preferred manner to mitigate impacts on historic archaeological resources and expressly requires a discussion of preservation in place in an EIR involving a historical archaeological site:

"Public agencies should, whenever feasible, seek to avoid damaging effects on any historical resource of an archaeological nature. *The following factors shall be considered and discussed in an EIR for a project involving such an archaeological site*:

"(A) Preservation in place is the preferred manner of mitigating impacts to archaeological sites. Preservation in place maintains the relationship between artifacts and the archaeological context. Preservation may also avoid conflict with religious or cultural values of groups associated with the site.

"(B) Preservation in place may be accomplished by, but is not limited to, the following:

"1. Planning construction to avoid archaeological sites;

"2. Incorporation of sites within parks, greenspace, or other open space;

"3. Covering the archaeological sites with a layer of chemically stable soil before building tennis courts, parking lots, or similar facilities on the site.

"4. Deeding the site into a permanent conservation easement.

"(C) When data recovery through excavation is the only feasible mitigation, a data recovery plan, which makes provision for adequately recovering the scientifically consequential information from and about the historical resource, shall be prepared and adopted prior to any excavation being undertaken. . . ." (Italics added.)

Guidelines section 15126.4, subdivision (a)(1)(B) states: "Where several measures are available to mitigate an impact, each should be discussed and

the basis for selecting a particular measure should be identified. Formulation of mitigation measures should not be deferred until some future time. However, measures may specify performance standards which would mitigate the significant effect of the project and which may be accomplished in more than one specified way."

The 2004 EIR stated that the phase two project was designed to avoid disturbing significant archaeological sites, but that the riparian corridor could not be constructed in a way that would completely avoid those sites. It stated that the only feasible mitigation measure for archaeological resources affected by the riparian corridor was data recovery in accordance with a data recovery plan. The 2004 EIR stated and the city council found that implementation of the data recovery plan and other mitigation measures would mitigate the impacts on historical archaeological resources to an insignificant level. The 2004 EIR quoted Guidelines section 15126.4, subdivision (b)(3), but did not discuss potential means to achieve preservation in place, as required.

We concluded in our prior opinion that the 2004 EIR failed to discuss preservation in place as a means to mitigate the significant effects on historical archaeological resources, as required.[6] (*City of Santa Monica v. City of Los Angeles (Playa Capital Company, LLC)*, supra, B189630.) We stated that the appeal was not moot despite the completion of all planned excavation of known archaeological sites because the City, in its discretion, could still require project modifications to mitigate impacts on archaeological resources and achieve greater preservation in place, such as by changing the course or depth of the riparian corridor and restoring archaeological resources to their prior resting places or restoring those items to other suitable locations on the project site. (*Ibid.*) We stated further that the required discussion of preservation in place could result in changes to the data recovery plan that would affect archaeological resources that may be discovered outside of the known archaeological sites. (*Ibid.*) Accordingly, the writ of mandate issued by the superior court ordered the City to "revise the EIR to discuss preservation in place in accordance with CEQA Guidelines section 15126.4, subdivisions (a)(1)(B) and (b)(3)."

The revised EIR states that preservation in place is the preferred manner of mitigating impacts to archaeological sites, but states that after the removal of archaeological resources from their resting places, preservation in place cannot be achieved. The revised EIR nonetheless discusses several alternative locations for the riparian corridor that would have minimized impacts on the

---

[6] We rejected the petitioners' other contentions regarding historical archaeological resources, however, including their challenge to the City's finding that the adopted mitigation measures would reduce the impacts to an insignificant level. (*City of Santa Monica v. City of Los Angeles (Playa Capital Company, LLC)*, supra, B189630.)

known archaeological sites. It states that the riparian corridor as constructed is superior to the alternatives for various reasons relating to flood protection, riparian habitat restoration and water quality. It also states that any use of the phase two project site would require the remediation of contamination and removal of buildings, asphalt and substructures, which would preclude preservation in place. It states further that the other potential means to achieve preservation in place set forth in Guidelines section 15126.4, subdivision (b)(3)(B)—incorporation of archaeological sites within open space, covering the sites and building recreational, parking or other facilities over them, and deeding the sites into a permanent conservation easement—were not feasible for the same reasons. The revised EIR states that preservation in place therefore was not feasible in 2004.

The revised EIR also states that to return the archaeological resources to their prior resting places and relocate the completed riparian corridor would destroy the existing riparian habitat and could result in the disturbance of additional archaeological resources. It states that the restoration of previously removed archaeological resources would conflict with curation requirements under the federal archaeological treatment plans, the programmatic agreement and federal law, and would not achieve preservation in place. The revised EIR concludes that data recovery and curation are appropriate mitigation measures.

The revised EIR also identifies other mitigation measures that were implemented on the phase two project before the vacation of the project approvals and states that the same mitigation measures would be implemented in connection with any future work on the project, including compliance with the federal archaeological treatment plans, monitoring of ground-disturbing activities by a project archaeologist and the temporary cessation of work and notification of responsible agencies if previously unknown archaeological resources are discovered. The city council adopted the proposed mitigation measures and found that they would reduce the impacts to an insignificant level.

We conclude that the revised EIR adequately discusses preservation in place as required by the Guidelines. It acknowledges that preservation in place is the preferred manner of mitigation. Unlike the 2004 EIR, the revised EIR discusses each of the potential means for preservation in place set forth in Guidelines section 15126.4, subdivision (b)(3)(B). It also discusses a data recovery plan as a means of mitigation pursuant to subdivision (b)(3)(C). We conclude that Ballona Wetlands has shown no abuse of discretion in this regard.

### 4. Global Climate Change

#### a. The Draft Revised EIR, Comments and Responses to Comments

The draft revised EIR included a new section on global climate change addressing primarily the phase two project's projected contribution to the cumulative impact of global climate change through its greenhouse gas emissions. It briefly noted that global warming could result in a rise in sea level and the inundation of coastal areas.

Ballona Wetlands Land Trust submitted a comment letter in April 2009 stating that the draft revised EIR failed to address the impacts of sea level rise resulting from global climate change. The letter stated that the revised EIR should address both the impacts of sea level rise on the phase two project and the extent to which the phase two project could exacerbate the impacts of sea level rise on the surrounding areas.

The letter included as an exhibit a draft paper by the California Climate Change Center entitled "The Impacts of Sea-Level Rise on the California Coast" (CCC Paper), and other exhibits.[7] The CCC Paper stated that a significant sea level rise by the year 2010 as a result of global climate change together with a 100-year flood could put at risk many inhabitants of California's coastal areas. It included a map purportedly showing the phase two project site within an area projected to be inundated by flood waters in that event. It cautioned against continued development of vulnerable areas.

The City responded that the projections in the CCC Paper represented an extreme worst-case scenario, relied on a faulty methodology, and overstated the flood risk. The City cited a report by Fred Greve, a professional engineer, so stating. The City's response and the Greve report also stated that more reliable estimates of sea level rise, including an estimate by the Intergovernmental Panel on Climate Change, were significantly lower than the estimate relied on in the CCC Paper. They stated that the CCC Paper failed to account for the fact that the project site was two miles from the ocean and unlikely to be affected by wave action, failed to account for elevated land between the project site and the coastline that would act as a barrier, and failed to account for the topography of the project site and building elevations. They stated that, contrary to the CCC Paper, the phase two project would not be subject to inundation as a result of sea level rise resulting from global climate change.

---

[7] The California Climate Change Center is a private organization funded by several public agencies. It released the final paper in May 2009, including a disclaimer stating that the paper did not necessarily represent the views of the funding agencies.

b. *The Revised EIR Was Not Required to Discuss the Impact of Sea Level Rise on the Project*

An EIR must identify and analyze the significant environmental effects that may result from the project. (Pub. Resources Code, § 21100, subds. (a), (b); Guidelines, §§ 15126.2, subd. (a), 15143.) "The purpose of an environmental impact report is to identify the significant effects on the environment of a project . . . ." (Pub. Resources Code, § 21002.1, subd. (a); see also *id.*, § 21061.) " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." (Pub. Resources Code, § 21068; see also Guidelines, § 15382.[8]) " 'Environment' means the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (Pub. Resources Code, § 21060.5; see also Guidelines, § 15360.)

Thus, the purpose of an EIR is to identify the significant effects of a project on the environment, not the significant effects of the environment on the project. (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 905 [98 Cal.Rptr.3d 137] (*City of Long Beach*).) The petitioner in *City of Long Beach* challenged the adequacy of an impacts analysis in an EIR for the construction of a new high school, arguing among other things that the EIR failed to address the impacts on staff and student health of emissions from nearby freeways. We held that the EIR was not required to discuss the impacts on staff and student health of locating the project near the freeways. (*Ibid.*) Similarly, *South Orange County Wastewater Authority v. City of Dana Point* (2011) 196 Cal.App.4th 1604, 1614–1618 [127 Cal.Rptr.3d 636] (*SOCWA*), rejected a challenge to a mitigated negative declaration relating to general plan and zoning amendments that allowed more intensive residential development, holding that the impact of noxious odors on future residents of the development was not a significant effect on the environment and therefore did not require an EIR. (See also *Baird v. County of Contra Costa* (1995) 32 Cal.App.4th 1464, 1468 [38 Cal.Rptr.2d 93].)

Guidelines section 15126.2, subdivision (a) states in part: "The EIR shall also analyze any significant environmental effects the project might cause by bringing development and people into the area affected. *For example, an EIR on a subdivision astride an active fault line should identify as a significant effect the seismic hazard to future occupants of the subdivision. The subdivision would have the effect of attracting people to the location and exposing*

---

[8] Guidelines section 15382 defines "significant effect on the environment" in relevant part as "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance."

*them to the hazards found there.* Similarly, the EIR should evaluate any potentially significant impacts of locating development in other areas susceptible to hazardous conditions (e.g., floodplains, coastlines, wildfire risk areas) as identified in authoritative hazard maps, risk assessments or in land use plans addressing such hazards areas." (Italics added.)

█ We believe that identifying the environmental effects of attracting development and people to an area is consistent with CEQA's legislative purpose and statutory requirements, but identifying the effects on the project and its users of locating the project in a particular environmental setting is neither consistent with CEQA's legislative purpose nor required by the CEQA statutes. We agree with *SOCWA, supra,* 196 Cal.App.4th at page 1616, that the Guidelines language italicized above is not an example of an environmental effect caused by development, but instead is an example of an effect on the project caused by the environment.[9] Contrary to Guidelines section 15126.2, subdivision (a), we hold that an EIR need not identify or analyze such effects. (*City of Long Beach, supra,* 176 Cal.App.4th at p. 905; cf. *SOCWA, supra,* at pp. 1616–1618.) █ Although the Guidelines ordinarily are entitled to great weight, a Guidelines provision that is unauthorized under CEQA is invalid. (*Laurel Heights I, supra,* 47 Cal.3d at p. 391, fn. 2; *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 109–110 [126 Cal.Rptr.2d 441].)

█ Appendix G of the Guidelines is a sample checklist form that is suggested for use in preparing an initial study. (See Guidelines, § 15063, subd. (f).) A few of the questions on the form concern the exposure of people or structures to environmental hazards and could be construed to refer to not only the project's exacerbation of environmental hazards but also the effects on users of the project and structures in the project of preexisting environmental hazards. (E.g., "Would the project . . . [¶] . . . [e]xpose people or structures to potential substantial adverse effects, including the risk of loss, injury, or death involving . . . [¶] [r]upture of a known earthquake fault . . . .") We believe that to the extent that such questions may encompass the latter effects, the questions do not relate to environmental impacts under CEQA and cannot support an argument that the effects of the environment on the project must be analyzed in an EIR.

---

[9] In our view, the statement in Guidelines section 15126.2, subdivision (a) that "the EIR should evaluate any potentially significant impacts of locating development in other areas susceptible to hazardous conditions (e.g., floodplains, coastlines, wildfire risk areas) as identified in authoritative hazard maps, risk assessments or in land use plans addressing such hazards areas" is consistent with CEQA only to the extent that such impacts constitute impacts on the environment caused by the development rather than impacts on the project caused by the environment.

c. *The Revised EIR's Analysis of Sea Level Rise and Responses to Comments Were Adequate*

Ballona Wetlands and BEEP contend the revised EIR failed to discuss the impacts of the project on the surrounding area in the event of sea level rise resulting from global climate change.[10] They contend the failure to discuss this subject rendered the revised EIR inadequate, and the City's responses to comments on this subject were inadequate.

 An EIR must identify and analyze the significant environmental impacts that may result from the project. (Pub. Resources Code, § 21100, subds. (a), (b); Guidelines, §§ 15126.2, subd. (a), 15143.) It must include facts and analysis sufficient to allow the decision makers and the public to understand the environmental consequences of the project. (Guidelines, § 15151; *California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 262 [115 Cal.Rptr.3d 631].) The analysis need not be exhaustive, but it must be reasonably complete and reflect a good faith effort at full disclosure. (Guidelines, § 15151; *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 712 [270 Cal.Rptr. 650].) We review challenges to the scope of an EIR's analysis of an environmental impact under the substantial evidence test. (*City of Long Beach, supra,* 176 Cal.App.4th at p. 898.)

 An agency must evaluate and respond to timely comments on the draft EIR that raise significant environmental issues. (Pub. Resources Code, § 21091, subd. (d); Guidelines, § 15088.) Responses must describe the disposition of the issues raised in the comments. (Pub. Resources Code, § 21091, subd. (d)(2)(B); Guidelines, § 15088.) If the agency rejects a recommendation or objection concerning a significant environmental issue, the response must explain the reasons why. (Guidelines, § 15088, subd. (c).) Responses must articulate "good faith, reasoned analysis in response," and not mere "[c]onclusory statements unsupported by factual information." (*Ibid.*; see *Environmental Protection Information Center, Inc. v. Johnson* (1985) 170 Cal.App.3d 604, 628 [216 Cal.Rptr. 502].)

The draft revised EIR briefly noted that global warming could result in sea level rise and the inundation of coastal areas, but provided no specific

---

[10] We deny Ballona Wetlands's request for judicial notice of a flood hazard map purportedly prepared by the City in 2008. The map was not part of the administrative record and was not before the City at the time of the EIR certification and project approval in 2010. Ballona Wetlands has shown no extraordinary circumstances to justify the consideration of such extra-record evidence. (Code Civ. Proc., § 1094.5, subd. (e); *Sierra Club v. California Coastal Com.* (2005) 35 Cal.4th 839, 863 [28 Cal.Rptr.3d 316, 111 P.3d 294]; *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573 & fn. 4 [38 Cal.Rptr.2d 139, 888 P.2d 1268].)

analysis of the impact on the phase two project site. In response to comments regarding the potential for inundation of the project site based on the CCC Paper, the City cited a report by a professional engineer stating that the CCC Paper was flawed and that more reliable estimates of sea level rise, including an estimate by the Intergovernmental Panel on Climate Change, suggested that the project would not be subject to inundation as a result of sea level rise resulting from climate change.

We conclude that the revised EIR provided information and analysis sufficient to serve the revised EIR's informational purposes and that the responses explained in sufficient detail the reasons that the City rejected the assertion that the project would be subject to inundation. The fact that Ballona Wetlands and BEEP disagree with the responses and question Greve's qualifications in this area does not render the responses inadequate. Ballona Wetlands and BEEP have shown no abuse of discretion.[11]

### 5. *Project Description and Land Use Impacts*

#### a. *The 2004 EIR and Our Prior Opinion*

The Playa Vista phase one and phase two projects together occupy an area known as "Area D." The zoning designations in the specific plan governing Area D restricted uses on the phase two site to only residential (R4(PV)) and office and light industrial (M(PV)). The specific plan limited the total number of residential units in all of Area D to 3,246 and restricted office and light industrial uses in all of Area D to 2,950,000 square feet (M(PV)) and 2,050,000 (C2(PV)).[12] After the approval of phase one, including the construction of 3,246 residential units and 2,841,950 square feet of office and light industrial (M(PV)) space (in addition to 400,000 square feet of regional mixed commercial space and 35,000 square feet of retail space), the specific plan allowed no additional residential units in Area D, and only 108,050 square feet of office and light industrial (M(PV)) space (2,950,000 - 2,841,950 = 108,050) could be built on the phase two site. Approval of the phase two development consisting of 2,600 residential units, 175,000 square feet of office space, 150,000 square feet of retail space, and 40,000 square feet of community-serving uses therefore required amendments to the specific plan to allow the additional development beyond only 108,050 square feet of office and light industrial space. The proposed additional development was a large increase in the amount of development allowed on the phase two site.

---

[11] Ballona Wetlands does not argue and has not shown that there was any significant new information requiring the recirculation of the draft revised EIR. (See Pub. Resources Code, § 21092.1; Guidelines, § 15088.5.)

[12] The specific plan also allowed up to 650,000 square feet of retail space (C2(PV)) in Area D.

The 2004 EIR stated that the phase two project would require amendments to the general and specific plans, including amendments to "modify the land uses and densities currently allowed by" and "adjust the land use entitlement allowed in" the specific plan. The project description did not state that the existing specific plan allowed the development of only 108,050 square feet of office and light industrial space on the phase two site and no other development, and did not disclose that the project would dramatically increase the amount of development allowed on the phase two site or that the amendments to "modify" and "adjust" the land use restrictions would increase the permissible development from only 108,050 square feet of office and light industrial space to 2,600 residential units, 175,000 square feet of office space, 150,000 square feet of retail space, and 40,000 square feet of community-serving uses.

The project description in the 2004 EIR stated that, compared with prior development proposals, the proposed phase two project "greatly reduces the scale of the Playa Vista development by limiting development to the remaining portion of Area D, on approximately 111 acres adjacent to the Playa Vista First Phase Project." The project description did not acknowledge that the proposed project would greatly increase the amount of development permissible under the existing specific plan.

The executive summary section also stated that the proposed phase two project reduced the scale of development compared with prior proposals and, for the most part, failed to acknowledge that the project would dramatically increase the amount of development permissible on the phase two site. The second sentence of the executive summary stated, "As described more fully in Section I.D., the Proposed Project greatly reduces the scale of development in comparison to previous proposals within the larger area known as Playa Vista." The summary of the project's land use impacts stated that the proposed specific plan amendments "would enable the Project's proposed development of housing uses in place of office, retail, and hotel uses allowed under the existing Specific Plan." That statement suggested that the amendments involved the substitution of additional residential units in the place of office, retail, and hotel uses that were then allowed on the phase two site. That statement was inaccurate because there was no substitution or exchange involved, but only an increase in the permissible area of office and light industrial uses (from 108,050 to 175,000 square feet), an increase in the number of residential units (from zero to 2,600), and an increase in the area of retail space (from zero to 150,000 square feet) and community-serving uses (from zero to 40,000 square feet) over that which was then allowed on the phase two site. The statement apparently was based on the unstated assumption that the square footage of land uses allowed under the specific plan and not developed in phase one was available for development in phase

two without regard to whether the phase two site was actually zoned for those uses. That assumption was untrue.

The analysis of land use impacts also stated that the proposed phase two project would reduce the amount of development that otherwise would be available on the site. Those purported reductions were illusory, however, because they were calculated based on office space, retail space, and hotel rooms that could not be developed on the phase two site under the existing specific plan. The City's responses to comments persisted in describing the project as a reduction in the amount of development allowed in Area D.

We concluded in our prior opinion that the land use analysis in the 2004 EIR was materially misleading with respect to the effect of the proposed specific plan amendments on the amount of development allowed on the phase two project site.[13] We stated that misstatements in the 2004 EIR created a substantial likelihood that the decision makers and the public would not fully appreciate the fact that the proposed project represented a substantial increase in the amount of permissible development on the phase two site, diverted attention away from the project's true impacts on land use, and impaired the environmental review process. We therefore concluded that the EIR was deficient as an informational document and that the City failed to proceed in a manner required by law. (*City of Santa Monica v. City of Los Angeles (Playa Capital Company, LLC)*, *supra*, B189630.) We stated that the City must revise its analysis of land use impacts in the EIR so as to accurately disclose the effect of the proposed specific plan amendments on the amount of development allowed on the phase two site. (*Ibid.*)

We therefore reversed the judgment denying the petition for writ of mandate with directions to the superior court to issue a peremptory writ of mandate granting some of the relief requested in the petition. (*City of Santa Monica v. City of Los Angeles (Playa Capital Company, LLC)*, *supra*, B189630.) Accordingly, the superior court entered a judgment granting the petition in part and denying it in part, and issued a writ of mandate ordering the City to revise the analysis of land use impacts in the EIR.

---

[13] BEEP characterized this problem as a deficient project description. We held that the land use analysis was misleading and stated that we need not decide whether the project description was deficient as well because "a revised analysis of land use impacts that accurately discloses the effect of the amendments on the amount of development allowed on the phase two site will correct the problem." (*City of Santa Monica v. City of Los Angeles (Playa Capital Company, LLC)*, *supra*, B189630.)

### b. *BEEP's New Challenges to the Project Description and to the Finding on Land Use Consistency Are Beyond the Scope of the Postjudgment Proceedings*

BEEP now argues that the project description is deficient for another reason. BEEP argues that language in the statement of overriding considerations adopted by the city council in 1994 for the phase one project indicates that the developer agreed to eliminate certain development rights affecting the remainder of Area D, and the project description in the revised EIR is misleading because it fails to disclose this. BEEP also challenges the finding of no significant impact on land use consistency. Neither BEEP nor any other party timely asserted these arguments in the prior appeal, and the 2008 judgment and writ of mandate did not address these issues.[14]

■ The entry of judgment ordinarily terminates a trial court's jurisdiction to rule on the merits of a case, apart from ruling on a new trial motion, a motion to vacate the judgment or a similar motion. (*Nave v. Taggart* (1995) 34 Cal.App.4th 1173, 1177 [40 Cal.Rptr.2d 714]; *Passavanti v. Williams* (1990) 225 Cal.App.3d 1602, 1606 [275 Cal.Rptr. 887].) But a trial court retains jurisdiction to enforce the judgment (Code Civ. Proc., § 128, subd. (a)(4)), including ensuring compliance with a peremptory writ of mandate. (*Carmel-by-the-Sea, supra*, 137 Cal.App.3d at p. 971; *County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 205 [139 Cal.Rptr. 396].)

■ A peremptory writ of mandate in a CEQA proceeding should order the agency to file a return by a date certain informing the court of the agency's actions in compliance with the writ. (*Endangered Habitats League, Inc. v. State Water Resources Control Bd.* (1997) 63 Cal.App.4th 227, 244 [73 Cal.Rptr.2d 388]; see 2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2011) § 23.121, p. 1265.) Public Resources Code section 21168.9, subdivision (b) states, in relevant part, "The trial court shall retain jurisdiction over the public agency's proceedings by way of a return to the peremptory writ until the court has determined that the public agency has complied with this division." This statutory provision for the retention of jurisdiction reflects the rule that a court issuing a peremptory writ of mandate retains jurisdiction to determine the adequacy of the return and ensure full compliance with the writ. (*Carmel-by-the-Sea, supra*, 137 Cal.App.3d at p. 971; *County of Inyo v. City of Los Angeles, supra*, 71 Cal.App.3d at p. 205.)

---

[14] BEEP briefly mentioned in a supplemental letter brief filed in the prior appeal in response to another question raised by this court that the City's L.A. CEQA Thresholds Guide would require a finding of a significant impact on land use consistency. BEEP failed to argue this point in its opening brief in the prior appeal, however, and this court did not request supplemental briefing on this issue.

We conclude that the trial court's retained jurisdiction under Public Resources Code section 21168.9, subdivision (b) is limited to ensuring compliance with the peremptory writ of mandate. After considering the petitioner's challenges to an EIR or other agency action and rendering a final judgment and peremptory writ of mandate, a trial court evaluating a return to the writ may not consider any newly asserted challenges arising from the same material facts in existence at the time of the judgment. To do so would undermine the finality of the judgment.

We addressed a similar question in *Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180 [24 Cal.Rptr.3d 543]. That case involved the City's approval of a "General Plan Framework." The trial court in a prior proceeding had rejected the petitioners' challenges to the City's CEQA findings and to the sufficiency of the EIR. (126 Cal.App.4th at pp. 1190–1191.) We reversed the judgment in that prior proceeding with directions to grant the petition in part. (*Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1266–1267 [100 Cal.Rptr.2d 301].) After the entry of judgment on remand and issuance of a peremptory writ of mandate, the City vacated its approval of the General Plan Framework, adopted new CEQA findings and a statement of overriding considerations, and readopted the General Plan Framework. (*Federation of Hillside & Canyon Assns. v. City of Los Angeles, supra*, 126 Cal.App.4th at pp. 1191–1192.) The petitioners then commenced a second proceeding by filing another petition for writ of mandate. The trial court denied the petition in the second proceeding. (*Id.* at p. 1193.)

On appeal, we concluded that the City's findings concerning several environmental impacts were substantially identical to its prior findings on those matters. (*Federation of Hillside & Canyon Assns. v. City of Los Angeles, supra*, 126 Cal.App.4th at p. 1202.) We held that the doctrine of res judicata barred the petitioners' challenges to those findings in the second proceeding either because the petitioners had failed to challenge those findings in the prior proceeding or, as to one finding, because they had unsuccessfully challenged the finding in the prior proceeding. (*Id.* at p. 1204.) We concluded that because the material facts had not changed and the issues asserted in the later proceeding could have been asserted in the prior proceeding, and because the other requirements of res judicata were satisfied, the application of res judicata was appropriate. (*Id.* at pp. 1204–1205.) *Silverado Modjeska Recreation & Park Dist. v. County of Orange* (2011) 197 Cal.App.4th 282, 298 [128 Cal.Rptr.3d 772], similarly held that a decision in a prior proceeding that the county had complied with a peremptory writ of mandate was res judicata and precluded later challenges to the county's compliance with the writ.

*Federation of Hillside & Canyon Assns. v. City of Los Angeles, supra*, 126 Cal.App.4th 1180, involved the res judicata effect of a judgment from a prior

proceeding and therefore is distinguishable to the extent that this case involves the scope of the trial court's continuing jurisdiction in the same proceeding. Our holding in that opinion, however, is consistent with our conclusion here in that both protect the finality of a judgment on the merits in a CEQA proceeding.

██ Accordingly, we conclude that any challenge to an EIR or other agency action arising from facts in existence before the entry of judgment must be asserted in the proceeding before the entry of judgment. The failure to assert such a challenge before the entry of judgment or the failure to successfully appeal the judgment on an issue arising from facts in existence before the entry of judgment precludes a party from asserting the challenge in connection with postjudgment proceedings concerning compliance with the writ. (See *San Franciscans for Reasonable Growth v. City and County of San Francisco* (1989) 209 Cal.App.3d 1502, 1517–1518 [258 Cal.Rptr. 267] [rejected a challenge to an EIR's impacts analysis after the issuance of a peremptory writ of mandate as beyond the scope of the additional environmental review ordered in the writ].) ██ We therefore conclude that BEEP's new challenges to the project description and to the finding on land use consistency asserted in the objection to the supplemental return are beyond the scope of the postjudgment proceedings and that the trial court properly rejected them.

BEEP also asserted those same new challenges in its petition for writ of mandate filed in May 2010, which was later consolidated with the prior proceeding. Because those challenges asserted in the new petition could have been asserted before the entry of judgment in the prior proceeding and the material facts have not changed, BEEP's challenges to the project description and to the finding on land use consistency asserted in its latest petition for writ of mandate are barred by res judicata. (*Federation of Hillside & Canyon Assns. v. City of Los Angeles, supra*, 126 Cal.App.4th at pp. 1204–1205.)

### 6. Costs Award

Finally, Ballona Wetlands and BEEP contend the award of costs to the City and Playa Capital was error because the City and Playa Capital are not prevailing parties in these proceedings. Ballona Wetlands and BEEP argue that they prevailed by successfully petitioning for a writ of mandate.

The 2008 judgment granting in part and denying in part the petitions for writ of mandate awarded costs to the petitioners, including Ballona Wetlands and BEEP. The 2010 judgment states that the City and Playa Capital, "as prevailing parties, are entitled to costs in accordance with applicable law." We construe the award of costs in the 2010 judgment as limited to the

proceeding in which the City and Playa Capital prevailed, that is, the proceeding on the petition for writ of mandate filed by BEEP in May 2010. The City and Playa Capital, as prevailing parties, are entitled to recover their costs incurred in that proceeding. (Code Civ. Proc., §§ 1032, subd. (b), 1109; *Chaparral Greens v. City of Chula Vista* (1996) 50 Cal.App.4th 1134, 1151–1153 [58 Cal.Rptr.2d 152].) Ballona Wetlands and BEEP have shown no error in this regard.

## *DISPOSITION*

The judgment and order are affirmed. The City and Playa Capital are entitled to recover their costs on appeal. Upon issuance of the remittitur herein, the stay that we ordered on May 3, 2011, shall be vacated.

Klein, P. J., and Aldrich, J., concurred.

A petition for a rehearing was denied December 28, 2011, and the petition of appellant Ballona Wetlands Land Trust for review by the Supreme Court was denied March 21, 2012, S199392.