Filed 1/30/19

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BERKELEY HILLS WATERSHED COALITION et al.,<br><br>  Plaintiffs and Appellants,<br><br>v.<br><br>CITY OF BERKELEY et al.,<br><br>  Defendants and Respondents.<br><br>MATTHEW WADLUND et al.,<br><br>  Real Parties in Interest and Respondents. | A153942<br><br>(Alameda County<br>Super. Ct. No. RG17853768) |

Defendant City of Berkeley (City) approved the construction of three new single-family homes on adjacent parcels in the Berkeley Hills. Plaintiffs filed a petition for writ of mandate in the superior court opposing the approval because (1) the proposed construction was subject to the "location" exception to the Class 3 exemption for "up to three single-family residences" in urbanized areas under the California Environmental Quality Act (CEQA; Pub. Resources Code,[1] § 21000 et seq.) and (2) the City failed to comply with several provisions of its zoning ordinance in approving the project. The trial court denied the petition for writ of mandate. We affirm.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.C. and II.D.

[1] All undesignated statutory references are the Public Resources Code unless otherwise specified.

# I. BACKGROUND

Real parties in interest, Matthew Wadlund (Wadlund), Alexandra Destler Wadlund, Eric S. Schmier, individually and as the trustee of the Eric S. Schmier 2010 Living Trust, and Kenneth J. Schmier, individually and as the trustee of the Kenneth J. Schmier 2010 Separate Property Trust, are owners of three contiguous parcels of land on Shasta Road in Berkeley, California. In January 2016, Wadlund submitted separate applications for use permits to construct three new single-family homes on the parcels. The proposed development sites are located in Berkeley's R-1(H) zoning district, on steeply sloped terrain.

In connection with the permit applications, Wadlund hired Alan Kropp & Associates, Inc. (Kropp & Associates) to prepare a geotechnical and geologic hazard investigation of the proposed residences. The report noted "[t]he western portion of the site is within the Alquist-Priolo Earthquake Fault Zone (APEFZ) established by the State of California along the Hayward fault" and the "site is also located in a potential earthquake-induced landslide area mapped by the California Geologic Survey on their Seismic Hazard Mapping Act map for this area." The purpose of the investigation was "to evaluate the geotechnical and geologic conditions that exist at the site, including landsliding and fault rupture, and their potential impact on the project." The report concluded the site was suitable for the proposed residences and offered recommendations for the design and construction of the project to "minimize possible geotechnical problems."

The City retained Cotton, Shires and Associates, Inc. (Cotton/Shires) to peer review the investigation by Kropp & Associates. Cotton/Shires requested additional evaluation and further information about proposed design measures "to address slope instability concerns," noting the "[p]roposed site development is constrained by earthflow landslide material of moderate depth, soils with high expansion potential, unstable existing fill materials, and anticipated strong seismic ground shaking." After receiving two further responses and modifications from Kropp & Associates, Cotton/Shires eventually recommended approval of the permits, concluding the "geotechnical

2

evaluations and recommended project design measures satisfactorily address State requirements for investigation and mitigation within the mapped earthquake-induced landslide hazard zone."

After holding a public hearing and receiving public comments, the zoning adjustments board (Board) approved the use permits in September 2016.  The Board found the proposed projects[2] categorically exempt from CEQA under the Class 3 categorical exemption for new construction of small structures. (Cal. Code Regs., tit. 14, § 15303, subd. (a) [Class 3 exemption includes "up to three single-family residences" in "urbanized areas"].)[3]  Approximately one month later, a group of 24 neighbors appealed the decision to the city council, challenging the Board's CEQA exemption determination, and voicing concerns, among other things, about (1) a history of landslides on the site, (2) access for emergency vehicles and fire hazards, and (3) the failure of the staff report to delineate the "Usable Open Space" for the projects.  In an expanded appeal letter, the neighbors, joined by an additional 20 neighbors, also argued the projects violated the prohibition on "the addition of a fifth bedroom to a parcel" in the City's zoning ordinance.

In January 2017, the city council denied the appeal and approved the three use permits.  Plaintiffs[4] filed a petition for writ of mandate in the superior court.  In contesting the City's CEQA exemption findings, plaintiffs argued two exceptions to the

---

[2] The parties apparently disagree whether the City treated the three applications for use permits as one project or three separate projects, but neither party discusses how the issue affects our resolution of the issues raised in this appeal.   Because there were three separate applications, three separate sets of findings and conditions, and three separate use permit approvals, we will refer to "projects" rather than a single "project" in this opinion.

[3] Subsequent references to "Guidelines" are to the CEQA guidelines found in title 14 of the California Code of Regulations, section 15000 et seq.

[4] Plaintiffs are Berkeley Hills Watershed Coalition and Center for Environmental Structure.  Berkeley Hills Watershed Coalition is a nonprofit association formed by a group of the neighbors who opposed approval of the projects.  Center for Environmental Structure is a nonprofit corporation "dedicated to the shaping of our living environment so that it becomes deeply comfortable, beautiful and supportive for all human beings."

exemption applied: (1) the "location" exception under Guidelines, section 15300.2, subdivision (a); and (2) the "unusual circumstances" exception under Guidelines, section 15300.2, subdivision (c). Plaintiffs also argued the City's approval of the projects violated zoning requirements regarding "fifth bedrooms," useable open space, and fire safety and accessibility of emergency vehicles. The superior court denied the petition for writ of mandate, and this appeal followed.

## II. DISCUSSION

### A. *CEQA Findings*

The City found the projects fell within the CEQA "Class 3" categorical exemption, which applies to "construction and location of limited numbers of new, small facilities or structures," including "up to three single-family residences" in "urbanized areas." (Guidelines, § 15303.) "When a project comes within a categorical exemption, no environmental review is required unless the project falls within an exception to the categorical exemption." (*Aptos Residents Assn. v. County of Santa Cruz* (2018) 20 Cal.App.5th 1039, 1046 (*Aptos Residents*).) Because they do not dispute that the projects meet the requirements for a Class 3 exemption, plaintiffs bear the burden of demonstrating that the projects fall within an exception. (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1105 (*Berkeley Hillside I*) ["As to projects that meet the requirements of a categorical exemption, a party challenging the exemption has the burden of producing evidence supporting an exception."].)

Plaintiffs argue the City's determination here is erroneous because the projects meet the "location" exception set forth in Guidelines, section 15300.2, subdivision (a). The Guideline provides: "Location. Classes 3, 4, 5, 6, and 11 are qualified by consideration of where the project is to be located—a project that is ordinarily insignificant in its impact on the environment may in a particularly sensitive environment be significant. Therefore, these classes are considered to apply in all instances, except where the project may impact on an environmental resource of hazardous or critical concern where designated, precisely mapped, and officially adopted pursuant to law by federal, state, or local agencies." (Guidelines, § 15300.2, subd. (a).)

4

## 1. Standard of Review

Until relatively recently, the standard of review applicable to the three general exceptions to categorical exemptions set forth under Guidelines, section 15300.2, subdivisions (a) through (c) was a subject of disagreement among the appellate courts.[5] (See, e.g., *Hines v. California Coastal Com.*, *supra*, 186 Cal.App.4th at pp. 855–856.) Our Supreme Court offered guidance on that subject in *Berkeley Hillside I,* which like this case, involved a CEQA challenge to the City of Berkeley's approval of a use permit to construct a new home on a steep slope. (*Berkeley Hillside I, supra*, 60 Cal.4th at p. 1093.) *Berkeley Hillside I* settled the appropriate standard of review for the unusual circumstances exception under Guidelines, section 15300.2, subdivision (c).[6] (*Berkeley Hillside I*, at pp. 1114–1115.)

As our Supreme Court explained, "Section 21168.5 provides the standard of review in all . . . actions 'to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with [CEQA].' . . . Under it, a court's inquiry is 'whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citation.] Thus, reversal of the City's action here is appropriate only if (a) the City, in finding the proposed project categorically exempt, did not proceed in the manner required by law, or (b) substantial evidence fails to support that finding." (*Berkeley Hillside I, supra*, 60 Cal.4th at p. 1110.)

---

[5] The general exceptions are the unusual circumstances exception, the location exception, and the cumulative impacts exception. (See Guidelines, § 15300.2, subds. (a)–(c); *Hines v. California Coastal Com.* (2010) 186 Cal.App.4th 830, 855–856.)

[6] The unusual circumstances exception provides: "A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Guidelines, § 15300.2, subd. (c).) As noted above, plaintiffs asserted in the trial court that the projects at issue here fall within the unusual circumstances exception, but they have abandoned that argument on appeal.

*Berkeley Hillside I* held a bifurcated approach applies to an agency's determination with respect to the unusual circumstances exception. (*Berkeley Hillside I, supra*, 60 Cal.4th at pp. 1114–1115.) "The determination as to whether there are 'unusual circumstances' (Guidelines, § 15300.2, subd. (c)) is reviewed under section 21168.5's substantial evidence prong. However, an agency's finding as to whether unusual circumstances give rise to 'a reasonable possibility that the activity will have a significant effect on the environment' (Guidelines, § 15300.2, subd. (c)) is reviewed to determine whether the agency, in applying the fair argument standard, 'proceeded in [the] manner required by law.' " (*Id.* at p. 1114.)

In further elucidating these standards, the Supreme Court explained, "[w]hether a particular project presents circumstances that are unusual for projects in an exempt class is an essentially factual inquiry," and accordingly, "a reviewing court should apply the traditional substantial evidence standard" to that prong. (*Berkeley Hillside I, supra*, 60 Cal.4th at p. 1114.) "Under that relatively deferential standard of review, the reviewing court's ' "role" ' in considering the evidence differs from the agency's. [Citation.] ' "Agencies must weigh the evidence and determine 'which way the scales tip,' while courts conducting [traditional] substantial evidence . . . review generally do not." ' [Citation.] Instead, reviewing courts, after resolving all evidentiary conflicts in the agency's favor and indulging in all legitimate and reasonable inferences to uphold the agency's finding, must affirm that finding if there is any substantial evidence, contradicted or uncontradicted, to support it." (*Ibid.*)

As to the second part of the unusual circumstances exception, "whether there is 'a reasonable possibility' that an unusual circumstance will produce 'a significant effect on the environment' (Guidelines, § 15300.2, subd. (c)), a different approach is appropriate, both by the agency making the determination and by the reviewing courts." (*Berkeley Hillside I, supra*, 60 Cal.4th at p. 1115.) When " 'unusual circumstances' " are established, "it is appropriate for agencies to apply the fair argument standard in determining whether 'there is a reasonable possibility [of] a significant effect on the environment due to unusual circumstances.' " (*Ibid.*) "As to this question, the reviewing

6

court's function 'is to determine whether substantial evidence support[s] the agency's conclusion as to whether the prescribed "fair argument" could be made.' " (*Ibid.*)

We conclude the same bifurcated standard of review is applicable to the location exception. (See *Aptos Residents, supra,* 20 Cal.App.5th at p. 1048 [noting standard of review applicable to cumulative impact and location exceptions is "not as well settled" as unusual circumstances exception but concluding same standard of review applies to all three exceptions].) As with the unusual circumstances exception, the determination whether a project is located in "a particularly sensitive environment" (Guidelines, § 15300.2, subd. (a)) is essentially a factual inquiry, subject to the substantial evidence standard of review. Thus, in evaluating the agency's determination whether a project is located where there is "an environmental resource of hazardous or critical concern" (*ibid.*), the court applies a deferential standard of review, "resolving all evidentiary conflicts in the agency's favor and indulging in all legitimate and reasonable inferences to uphold the agency's finding." (*Berkeley Hillside I, supra,* 60 Cal.4th at p. 1114.) However, in determining whether the project "may impact on" the environmental resource because of its location, the court applies a fair argument standard of review.

## 2. Location Exception

Plaintiffs contend the projects in this case are subject to the location exception because the geotechnical report prepared in connection with the use permits stated the projects were located "within the Alquist-Priolo Earthquake Fault Zone (APEFZ) established by the State of California along the Hayward fault" and in a "potential earthquake-induced landslide area mapped by the California Geologic Survey on their Seismic Hazard Mapping Act map for this area."[7] Plaintiffs argue these facts are

---

[7] The trial court noted the project was *not* located in the mapped Alquist-Priolo Earthquake Fault Zone (APEFZ). The geotechnical report states, however, that the "western portion of the site is within the [APEFZ]." Other sections of the report explain "[o]nly the extreme front portion of the parcel is within the APEFZ," and the "proposed home sites will all be located outside the APEFZ." The report also explains no active traces of the Hayward fault run through the site. Because the record reflects at least some

7

"undisputed," and therefore the court may determine, as a matter of law, that the agency erred. This is because, plaintiffs claim, under the plain language of the location exception, the APEFZ and earthquake-induced landslide areas are " 'environmental resources of *hazardous* or critical concern.' " We disagree.

Generally, we apply the same rules governing interpretation of statutes to the interpretation of administrative regulations. (*Berkeley Hillside I, supra*, 60 Cal.4th at p. 1097.) " 'We give the regulatory language its plain, commonsense meaning. If possible, we must accord meaning to every word and phrase in a regulation, and we must read regulations as a whole so that all of the parts are given effect. [Citation.] If the regulatory language is clear and unambiguous, our task is at an end, and there is no need to resort to canons of construction and extrinsic aids to interpretation. [Citation.]' [Citation.] Our primary aim is to ascertain the intent of the administrative agency that issued the regulation. [Citation.] When that intent 'cannot be discerned directly from the language of the regulation, we may look to a variety of extrinsic aids, including the purpose of the regulation, the legislative history, public policy, and the regulatory scheme of which the regulation is a part.' " (*Hoitt v. Department of Rehabilitation* (2012) 207 Cal.App.4th 513, 523.)

Employing those principles here, the language of the statute indicates it is the "environmental resource" which must be "designated, precisely mapped, and officially adopted pursuant to law." (Guidelines, § 15300.2, subd. (a).) But the statutes cited by plaintiffs map the physical locations of potential earthquakes and landslides. The plain meaning of "environmental *resource*" in the location exception does not encompass possible earthquake or landslide zones. A "resource" is a "natural source of wealth or revenue," or a "natural feature or phenomenon that enhances the quality of human life." (Merriam-Webster's Collegiate Dict. (11th ed. 2014) p. 1061.) Earthquakes and landslides are geologic events—and while they are indeed hazardous, they are not

portion of the site is in the APEFZ, however, we consider whether that fact renders the location exception applicable.

"resources." Thus, giving meaning to the phrase "environmental resource," we cannot conclude the location exception was intended to cover all areas subject to such potential natural disasters as a matter of law.

Though the language of the Guideline is clear and unambiguous, our interpretation is further supported by the stated purposes of the hazard mapping and zoning acts identified in the geotechnical report. As the trial court observed, the Seismic Hazards Mapping Act was enacted to prevent "economic losses" and "to protect public health and safety," not to identify the location of "environmental resource[s]." (§ 2691.) Specifically, the Legislature found and declared: "(a) The effects of strong ground shaking, liquefaction, landslides, or other ground failure account for approximately 95 percent of *economic losses* caused by an earthquake. [¶] (b) Areas subject to these processes during an earthquake have not been identified or mapped statewide, despite the fact that scientific techniques are available to do so. [¶] (c) It is necessary to identify and map seismic hazard zones in order for cities and counties to adequately prepare the *safety element* of their general plans and to encourage land use management policies and regulations to reduce and mitigate those hazards *to protect public health and safety*." (*Ibid.*, italics added; § 2692 [statute further intends to provide mapping and technical advisory program to assist cities and counties in protecting public health and safety risks arising from earthquakes and landslides].) Similarly, the APEFZ was enacted to "provide policies and criteria . . . to prohibit the location of . . . structures for human occupancy across the trace of active faults" and to "provide the citizens of the state with increased safety and to minimize the loss of life during and immediately following earthquakes . . . ." (§ 2621.5, subd. (a).) Looking to the purposes of the statutory schemes, the fact that the project site falls within mapped areas reflects governmental concern about damage to property and loss of human lives, not protection of a sensitive environmental resource.

Our interpretation is also supported by the purposes of CEQA. (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 382 (*California Building Industry Assn.*) ["CEQA was enacted to advance four

9

related purposes: to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, environmental damage; (3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclose to the public the rationale for governmental approval of a project that may significantly impact the environment."].) As our Supreme Court explained, "Despite [CEQA's] evident concern with protecting the environment and human health, its relevant provisions are best read to focus almost entirely on how projects affect the environment." (*Id.* at p. 387; *Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 473 (*Ballona Wetlands*) ["the purpose of an [environmental impact report] is to identify the significant effects of a project on the environment, not the significant effects of the environment on the project"].)[8] By its terms, the location exception applies "where the project may impact on an environmental resource." (Guidelines, § 15300.2, subd. (a).) The plain language in the exception reflects concern with the effect of the project on the environment, not the impact of existing environmental conditions (such as seismic and landslide risks) on the project or its future residents.

---

[8] Plaintiffs argue *California Building Industry Assn.* supports application of the location exception because it held agencies are required to evaluate a project's potential *exacerbating* effect on existing environmental conditions. (*California Building Industry Assn., supra*, 62 Cal.App.4th at p. 377.) First, it is not clear that holding controls here, because *California Building Industry Assn.* concerned preparation of an environmental impact report for a project that was not exempt, and thus did not consider the language in the location exception. Second, as plaintiffs themselves argue, its holding is more likely relevant to the second prong of the location exception—whether substantial evidence supports a fair argument the project "may impact on an environmental resource of hazardous or critical concern," which we address briefly below. Plaintiffs also contend *Ballona Wetlands, supra,* 201 Cal.App.4th 455, was limited by *California Building Industry Assn.,* but the California Supreme Court expressly noted *California Building Industry Assn.* was not inconsistent with *Ballona Wetlands,* which was one of several cases that implicitly held CEQA does not generally require an agency to analyze how existing hazards or conditions might impact a project's users or residents. (*California Building Industry Assn.*, at p. 392.)

Having concluded the location exception is not applicable based solely on the "undisputed" fact the project is located in a potential earthquake and landslide zone, we consider whether the City's determination that "the site is not located in an environmentally sensitive area" is otherwise supported by substantial evidence in the record. We have little trouble doing so.

As noted earlier, plaintiffs bore the burden of demonstrating the location exception applied here. Plaintiffs argue "the geotechnical reports show the project presents a serious risk of activating or exacerbating an existing landslide on the property," but the record citations they provide do not discuss any environmental resources on the project site that would be exposed to harm as a result. As described earlier, the geotechnical report by Kropp & Associates was prepared to "evaluate the geotechnical and geologic conditions that exist at the site, including landsliding and fault rupture, and *their potential impact on the project*." (Italics added.) The report noted a "small, localized landslide" may have an impact "on the middle lot building area and the central section of the new access driveway," and provides suggestions for removing and controlling the landslide. It also observes, "All owners or occupants of homes on hillsides should realize that landslide movements are <u>always</u> a possibility, although generally the likelihood is very low that such an event will occur." The peer review conducted by Cotton/Shires focused on the importance of mitigation measures to "reduce the risk of ground failure during an earthquake to a level that does not cause the collapse of buildings," but plaintiffs cite no language in the geotechnical reports that suggests the projects pose a risk of harm to the environmental resources on the sites, as opposed to people or buildings. Nor did plaintiffs submit their own geotechnical assessment, or any other evidence, to demonstrate the presence of "an environmental resource of hazardous or critical concern."[9] (Guidelines, § 15300.2, subd. (a).)

---

[9] We likewise reject any argument the project cannot be exempt because it relies on mitigation measures. Though " '[t]he distinction between elements of a project and measures designed to mitigate the impacts of the project may not always be clear,' " measures taken to comply with building codes or to address " 'common and typical

11

Plaintiffs also argue, for the first time on appeal, that the landslide risk is not only about the impact on the project's own residents, but about potential impacts of activating a landslide on the community of protected coast live oak trees on the parcels. Plaintiffs failed to raise this issue during the administrative process, and thus have failed to exhaust their administrative remedies. (§ 21177, subd. (a); *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 535 [" ' "exact issue" ' " must have been presented to the administrative agency for petitioner to raise issue on appeal].) Further, even had they raised the issue with the City, plaintiffs point to no evidence in the record supporting their argument that activation of a landslide would impact the coast live oak trees.

Finally, plaintiffs argue the trial court's interpretation of the location exception is inconsistent with section 21159.21, subdivision (h)(4) and (5), which set forth exceptions to a specific statutory exemption for housing projects located in seismic and landslide hazard areas. That section provides projects qualify for CEQA exemption if they are not subject to "(4) . . . a delineated earthquake fault zone . . . or a seismic hazard zone . . . . [or] [¶] (5) Landslide hazard . . . zone . . . ." (§ 21159.21, subd. (h)(4) & (5).) Plaintiffs contend these specific exceptions "provide further evidence of the legislature's intent that projects in seismic and landslide hazard areas . . . cannot be exempted from review under CEQA." To the contrary, however, the fact that the Legislature provided a specific exception for *housing projects* located in seismic and landslide areas but did not do the same for projects in Class 3, suggests it did not intend Class 3 projects to be subject to the same requirements. As our Supreme Court explained in *California Building Industry*

---

concerns' " during construction projects do not preclude Class 3 exemption. (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 241 Cal.App.4th 943, 960–961 (*Berkeley Hillside II*).) Here, the record reflects the "mitigation measures" plaintiffs identify were developed as part of the project design to meet building code requirements for properties located in seismic zones and address preexisting conditions on the site as opposed to being "proposed subsequent actions by the project's proponent to mitigate or offset the alleged adverse environmental impacts" of the project. (*Save the Plastic Bag Coalition v. City and County of San Francisco* (2013) 222 Cal.App.4th 863, 882–883, citing *Salmon Protection & Watershed Network v. County of Marin* (2004) 125 Cal.App.4th 1098, 1104 & 1108; *Berkeley Hillside II*, at p. 961.)

*Assn.,* "these statutes [(including § 21159.21, subd. (h))] constitute specific exceptions to CEQA's general rule requiring consideration only of a project's effect on the environment, not the environment's effects on project users. Accordingly, we cannot, as the [Bay Area Air Quality Management District] urges, extrapolate from these statutes an overarching, general requirement that an agency analyze existing environmental conditions whenever they pose a risk to the future residents or users of a project." (*California Building Industry Assn., supra*, 62 Cal.4th at p. 392.) By the same reasoning, we cannot extrapolate from the *specific* exception in section 21159.21, subdivision (h) an intent to apply the same requirements to a general exception like the location exception that does not include similar language.

Because we conclude the City's determination the project is not in an environmentally sensitive area is supported by substantial evidence, we need not reach the second prong of the location exception inquiry—whether substantial evidence supports a "fair argument" that the project "may impact" the mapped resource. (See, e.g., *Berkeley Hillside II, supra,* 241 Cal.App.4th at p. 958.) Even if we did, however, we would affirm the agency's exemption finding. Plaintiffs failed to identify any substantial evidence that would support a fair argument the project in this case will have an adverse effect on the environment. As noted above, the geotechnical reports prepared by Kropp & Associates and Cotton/Shires addressed potential impacts of the environment on the projects, and made recommendations for site preparation and earthwork, foundations, retaining walls, drainage, and other measures to reduce the impact of potential earthquakes and landslides on the projects. But plaintiffs point to no evidence in those reports that construction of the three proposed residences would exacerbate existing hazardous conditions or harm the environment.

**B. *Mini-dorm Ordinance***

Plaintiffs claim the City abused its discretion by misinterpreting and misapplying Berkeley Municipal Code section 23D.16.050 in approving the projects. Berkeley Municipal Code section 23D.16.050 (Ordinance No. 7306-NS) provides: "For the addition of a fifth bedroom to a parcel, an Administrative Use Permit (AUP) shall be

13

required. For the addition of any bedroom beyond the fifth, a Use Permit with Public Hearing (UPPH) shall be required." Plaintiffs argue because each of the proposed three houses have more than four bedrooms, the City was required to either issue an administrative use permit (AUP) or use permit with public hearing (UPPH) under Berkeley Municipal Code section 23D.16.050, or make specific findings of nondetriment regarding the number of bedrooms under section 23B.32.040 of the zoning ordinance. The City argued below, and argues on appeal, that because new construction already requires a use permit, requiring a second, separate permit for buildings with more than five bedrooms would be redundant.

At the city council hearing, City Planning Director Carol Johnson explained the AUP and UPPH requirements for buildings with more than four bedrooms do not apply to new construction, but only modifications of existing dwellings. That interpretation was supported by an opinion letter prepared by former City Attorney Zach Cowan, in response to a request from the former planning director. Cowan's letter explained Ordinance No. 7306-NS was adopted in July 2013 to address community concerns regarding the creation of "Mini-dorms," that result from the "addition of bedrooms to parcels," "which have negative impacts to the surrounding neighborhoods." The purpose of the ordinance was "to gain discretion over the creation of new Mini-dorms via the addition of bedrooms to existing buildings, which in many cases could otherwise be done without discretionary review." Opining that the ordinance did not apply to new construction, Cowan's letter observed, "Since construction of new dwelling units requires a Use Permit already, this purpose is already served by pre-existing zoning requirements, which require the same non-detriment finding as Ordinance No. 7,306-N.S."

The letter also explained the reference to "parcels" in the ordinance was intended to apply to the " 'addition' of bedrooms," not new construction. "The Planning Commission report states that the question under consideration was '[w]hether to link the addition of bedrooms to a unit, building or parcel. The Commission recommends that the bedroom addition regulations apply to each parcel.' In other words, the Planning Commission recommended that the ordinance be as broadly applicable as possible, i.e.,

14

any time a bedroom was added on a parcel that already had four or more bedrooms on it, regardless of the number of bedrooms in the specific building to which it was added." The letter concluded interpreting the ordinance "as applying to new construction of buildings with five or more bedrooms would be contrary to the legislative intent that led to its enactment, and would read it as redundant to pre-existing zoning provisions."

In interpreting municipal ordinances, we exercise our independent judgment as we would when construing a statute. (*Harrington v. City of Davis* (2017) 16 Cal.App.5th 420, 434.) Nonetheless, a city's interpretation of its own ordinance " 'is entitled to great weight unless it is clearly erroneous or unauthorized.' " (*Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1193.) In determining what weight to give an agency's interpretation of its own regulations, we apply the "complex of factors" set forth by our Supreme Court in *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 (*Yamaha*) [weight to be given an agency's interpretation is "fundamentally *situational*"].) Greater deference is accorded an agency's interpretation where " 'the agency has expertise and technical knowledge, especially where the legal text to be interpreted is . . . entwined with issues of fact, policy, and discretion. . . . since the agency is likely to be intimately familiar with regulations it authored and sensitive to the practical implications of one interpretation over another.' " (*Ibid*.) Deference is also appropriate when there are indications the agency's interpretation is likely to be correct. (*Id.* at pp. 12–13.)

In this case, it is appropriate to give the city attorney's opinion substantial deference because the "Mini-dorm ordinance" is intertwined with issues of "fact, policy, and discretion" regarding zoning requirements and impacts to neighborhoods and the local community. Moreover, the City is familiar with the rationale for the ordinance, is responsible for its implementation, and has special knowledge about the "practical implications" of possible interpretations.[10]

---

[10] Plaintiffs argue we should not defer to the City's interpretation of its own ordinance because after the City adopted the ordinance, it applied it to "new construction" when it approved use permits for two new construction projects in 2014

Even without according deference to the city attorney's letter, however, we conclude the City's interpretation of its ordinance is correct. Our review of local regulations is guided by the same established rules we use for statutory construction. (*Zubarau v. City of Palmdale* (2011) 192 Cal.App.4th 289, 305.) " '[W]e first look to the plain meaning of the statutory language, then to its legislative history and finally to the reasonableness of a proposed construction.' " (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082.)

Examining the plain meaning of the words used in the ordinance, an AUP or a UPPH is required for the "addition of a fifth bedroom to a parcel." The words "addition" and "fifth bedroom" imply the preexistence of four bedrooms on a parcel. The trial court thus correctly determined "[t]he plain meaning of 'addition' is that the bedroom must be added to an existing structure."

Further, contrary to plaintiffs' argument, the definition of "Addition" in the zoning ordinance supports the City's interpretation. An "Addition" is the "The creation of any new portion of a building which results in a vertical or horizontal extension of the building, or results in any new gross floor area that was not present in the building prior to construction of the addition." (Berkeley Mun. Code, § 23F.04.010.) The "creation of any new portion of a building" implies a building is already existing. That the Mini-dorm

and 2016, both of which contain specific findings pursuant to Berkeley Municipal Code section 23D.16.050 justifying the construction of more than four bedrooms. Plaintiffs contend such findings are "powerful evidence" the City originally intended the ordinance to cover new construction and its recent change of interpretation is inconsistent with that intent. (See *Yamaha, supra,* 19 Cal.4th at pp. 7–8, 12, 13 [evidence an agency " 'has consistently maintained the interpretation in question, especially if [it] is long-standing' " is a factor that supports judicial deference to an agency interpretation].) Whether the agency's interpretation is long-standing, however, is only one of several factors we consider under *Yamaha*. In any event, as discussed below, even without deferring to the city attorney's opinion, we independently conclude its interpretation is correct. (See *Stolman v. City of Los Angeles* (2003) 114 Cal.App.4th 916, 928 ["court has the duty ' " 'to state the true meaning of the statute finally and conclusively,' " notwithstanding the agency construction' "]; *McPherson v. City of Manhattan Beach* (2000) 78 Cal.App.4th 1252, 1266 [extrinsic evidence regarding city planner's interpretation of ordinance was irrelevant where meaning was clear and unambiguous as a matter of law].)

16

ordinance says the addition of a fifth bedroom is to "a parcel" does not defeat that interpretation. It simply means the ordinance will apply broadly to include any addition to an existing building on a parcel if the addition will result in more than four bedrooms on the parcel, regardless of the number or type of existing structures.

We also agree with the City this interpretation is consistent with the apparent intent of the ordinance. In articulating the rationale for the proposed ordinance, a 2013 report from the city manager and the director of planning and development to the city council explained the "addition of bedrooms to parcels increases the possibility that residential units could be turned into Mini-dorms" and noted "[i]ncreased levels of discretion for the addition of bedrooms to parcels . . . should address the concerns voiced by the community . . . ." These statements support the city attorney's explanation that the ordinance was passed to provide for discretionary review of such mini-dorms being created from the addition of bedrooms to already existing buildings, changes which otherwise might escape review by planning authorities. Because the City's interpretation of its own ordinance is supported by both the plain language of the regulation and the apparent legislative purpose, we reject plaintiffs' claim.[11]

---

[11] Plaintiffs also argue the City was required "to specifically address the prohibition on new dwellings with more than four bedrooms," either with a specific use permit under Berkeley Municipal Code section 23D.16.050 or by specific findings under section 23B.32.040. But plaintiffs do not point to any language in Berkeley Municipal Code section 23B.32.040 that either prohibits construction of new dwellings with more than four bedrooms or requires specific findings of nondetriment regarding the number of bedrooms exceeding four. (See Berkeley Mun. Code, § 23B.32.040.A ["The Board may approve an application for a Use Permit . . . only upon finding that the . . . construction of a building, structure or addition thereto, under the circumstances of the particular case existing at the time at which the application is granted, will not be detrimental to the health, safety, peace, morals, comfort or general welfare of persons residing or working in the area or neighborhood of such proposed use . . . ."].) We likewise reject plaintiffs' argument that the mini-dorm ordinance would only be "redundant" for new construction if the City was required to make such findings. The mini-dorm ordinance was enacted, as explained, to provide for discretionary review of projects that would otherwise escape review. For reasons explained above, we conclude Berkeley Municipal Code section 23D.16.050 does not apply to the proposed projects in this case.

17

## C. *Open Space*

Berkeley Municipal Code section 23D.16.070.F specifies minimum open space requirements for new residential development in single-family residential zones.[12] The ordinance sets forth nine limits on what can be considered "open space," including the requirement that "[n]o area which exceeds 8% grade shall qualify as usable open space." (Berkeley Mun. Code, § 23D.04.050.E.) Plaintiffs contend the City erred in determining the three proposed projects would have sufficient open space because their findings are conclusory, are not supported by substantial evidence, and the only evidence in the record contradicts the City's findings.

We review the City's factual findings that the projects met the open space requirements for substantial evidence. (*Horwitz v. City of Los Angeles* (2004) 124 Cal.App.4th 1344, 1354.) We indulge all presumptions and resolve all evidentiary conflicts in favor of the agency's findings and decision. (*Ibid.*)

Upon review of the entire record, we conclude substantial evidence supports the City's finding the projects meet the open space requirements. Real parties in interest completed "Tabulation Forms" with their permit applications that specify usable square footage of 825, 820, and 1,010 feet, respectively, for the three properties, far in excess of the 400-square-foot requirement. City planning staff included the same square footage of usable open space in a table summarizing the "Development Standards" for the properties, and city staff found in its analysis that each project would be "Adherent to all applicable regulatory requirements of the Zoning Ordinance." Further, in written responses to plaintiffs' appeal to the city council, city planning staff noted that for each project, "Prior to presenting this project to the [Board] with a recommendation to approve, staff confirmed that the new dwelling would be provided with at least 400 square feet of useable open space, which is the minimum required for a new dwelling in the R-1(H) district." At the city council meeting in January 2017, city planning staff

---

[12] Plaintiffs' unopposed request for judicial notice of Berkeley Municipal Code section 23D.16.070 is granted. (Evid. Code, §§ 452, subd. (b); 459, subd. (b).)

member Layal Nawfal also confirmed the usable open space requirement in the zoning ordinance is satisfied for the property. Specifically, in response to an expressed concern in the "appeal materials" regarding balconies being used as open space, Nawfal stated, "[T]he property provides open space in terms of decks and rooftops, so the restriction of 50 percent is particular to balconies. [¶] That does not apply to decks and rooftops that don't have any walls and are open to the air." (See *City of Rancho Cucamonga v. Regional Water Quality Control Bd.* (2006) 135 Cal.App.4th 1377, 1387 [agency may rely on staff opinion in reaching decisions, and staff opinions may constitute substantial evidence].) The record also contains drawings reflecting finish grading plans and floor plans for each of the parcels which show substantial areas allocated to courtyards, patios, and decks. Plaintiffs fail to explain why this evidence is insufficient.

Instead, plaintiffs argue geotechnical reports, communications between the City and real parties in interest, and topographical maps in the record show slopes on the unimproved, existing property well in excess of 8 percent which cannot serve as open space. As the City notes, however, the open space requirements pertain to finished projects, not the natural slope of the land before construction. In any event, even if there is substantial conflicting evidence in the record, we may not weigh the evidence or substitute our judgment for that of the City. (*McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 921 [reviewing court presumes agency decision is supported by substantial evidence and petitioner bears burden of demonstrating to the contrary; court may not substitute its own findings and inferences for that of the agency].) The burden was on plaintiffs "to show there is no substantial evidence whatsoever to support the findings of the [City]." (*Saad v. City of Berkeley* (1994) 24 Cal.App.4th 1206, 1212.) Because they have failed to meet that burden, we must affirm.

Plaintiffs also fault the City for failing to "explain" its "conclusory" findings that the open space requirements are met in this case, but the authority they rely on is inapposite. Plaintiffs cite, for example, *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 516–517 (*Topanga I*) to support their argument the City failed to disclose its "mode of analysis" and explain how the evidence shows the

19

project retains enough usable space. *Topanga I,* however, involved approval of a zoning variance under Government Code section 65906 " '*only* when, because of *special* circumstances applicable to the property, . . . the strict application of the zoning ordinance deprives such property of privileges enjoyed by other property in the vicinity and under identical zoning classification.' " (*Topanga I*, at p. 520, italics added by *Topanga I*.) There, the language of the statute required the agency to compare the characteristics of the property at issue with surrounding properties, but the agency's decision "focus[ed] almost exclusively on the qualities of the property for which the variance was sought." (*Ibid.*) Accordingly, our high court concluded the agency's administrative findings did not justify the variance. (*Id.* at p. 522*.*)

Nor do we find *Next Century Associates, LLC v. County of Los Angeles* (2018) 29 Cal.App.5th 713 *"*on point" as plaintiffs contended at oral argument. In that case, Next Century Associates, LLC (Next Century) sought a property tax refund, arguing it was entitled to a reduction in the assessed value of its hotel based on market conditions following the global economic crisis that began in late 2008. (*Id.* at p. 715.) The county assessment board rejected Next Century's application and upheld the existing roll value of the property, even though both Next Century and the county assessor agreed the assessed valuation was too high and no evidence in the record showed the existing roll value remained valid. (*Id.* at pp. 720, 723–724.) Under those circumstances, the court concluded the assessment board's decision to maintain the existing roll value was arbitrary and emphasized "it was incumbent on the Board to explain in far more detail the deficiencies it perceived in Next Century's analysis so that the parties could understand *why* the Board rejected Next Century's analysis, and its rationale for affirming the discredited enrolled value." (*Id.* at p. 723.) In other words*,* the board was required to explain how it reached its conclusion because it was *undisputed* the assessed valuation was too high and the only evidence in the record showed it was inaccurate. Here, by contrast, the City repeatedly affirmed the open space requirements were met, and

20

plaintiffs have not shown that determination is unsupported by the evidence in the record.[13]

In *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1989) 214 Cal.App.3d 1348 (*Topanga II*), an unrelated case involving the same parties but a different property, the appellate court rejected the notion that the Supreme Court's decision in *Topanga I, supra*, 11 Cal.3d 506 required detailed open space findings to support a county's decision to approve development of a tract of land. As the *Topanga II*, court observed, "Findings are required to state only ultimate rather than evidentiary facts." (*Id.* at p. 1362.) Here, the City was not required to further explain its implied finding the open space requirements were met. (See, e.g., *Young v. City of Coronado* (2017) 10 Cal.App.5th 408, 421–422 [when zoning ordinance authorizes agency to approve a conditional use only upon making specified factual findings, *Topanga I* does not prevent the agency from making findings in the language of the ordinance or require the agency support those findings with subfindings]; *Levi Family Partnership, L.P. v. City of Los Angeles* (2015) 241 Cal.App.4th 123, 132.) Moreover, we liberally construe an agency's findings to support rather than defeat the decision under review. (*Young*, at p. 421.) Under these standards, and because the City's implied "open space" finding is supported by substantial evidence in the record, we reject plaintiffs' claim.

**D.** *Emergency Vehicles and Fire Access*

In their appeal to the city council, plaintiffs also complained the project presents a danger to public health and welfare because of the extremely tight access for emergency

---

[13] At oral argument, plaintiffs observed an agency cannot make a finding that something is true just because the agency says it is true, and argued the City erred in relying on unsupported statements that the open space requirements of the ordinance were met. As explained above, however, the record contained specific tabulations reflecting more than double the required open space for each property and site plans for each parcel showing each proposed use of the finished space, all of which were submitted to the City with the permit applications. Plaintiffs fail to explain why this evidence, combined with staff statements confirming the requirements were met, does not constitute substantial evidence in support of the City's decision.

21

vehicles and potential fire hazards resulting from restricted access. The Board and the city council determined the dwellings would have to comply with building and fire codes during the building permit process, but fire safety issues were outside the "purview" of their review of use permit applications. Plaintiffs contend this was error, and the City was required to make findings on whether the project's fire, safety, and emergency vehicle access impacts would be detrimental to the public's health, safety, or welfare.

As required by Berkeley Municipal Code sections 23D.16.090 and 23B.32.040.A, the city council found "the project, under the circumstances of this particular case existing at the time at which the application is granted, would not be detrimental to the health, safety, peace, morals, comfort, and general welfare of the persons residing or working in the neighborhood of such proposed use or be detrimental or injurious to property and improvements of the adjacent properties, the surrounding area or neighborhood, or to the general welfare of the City . . . ." Plaintiffs cite no apposite legal authority[14] in support of their contention the Board or city council were required to make specific findings with respect to emergency vehicle access or fire hazards. Moreover, the city council's nondetriment findings are supported by substantial evidence in the record with respect to fire and emergency vehicle access. In response to concerns expressed during the appeal process, specifically, the "tight quarters with minimal setbacks and one narrow means of egress," planning staff set forth the specific setbacks for the property, noted the driveway for the project had been reviewed by the City's traffic engineer, and observed technical review of the building, public works, and fire codes were not within the Board's purview. Staff also noted no evidence had been presented to show the "dwelling would pose a unique fire risk to this site or to neighboring properties, or that site-specific COAs[15] are needed to address Fire, Traffic or Building and Safety concerns." Though plaintiffs claim they did present such evidence, they cite only to

---

[14] Plaintiff again cite to *Topanga I, supra,* 11 Cal.3d 506, in support of their argument the City failed to make required findings, but for the same reasons discussed above, that case does not assist plaintiffs here.

[15] Presumably, "conditions of approval."

22

general concerns about the width of the road, a fire in 1923 that "destroyed all the existing houses in the area and most of North Berkeley," and a letter from a neighboring property owner referencing a list purportedly generated by the Berkeley Fire Department showing streets and/or properties subject to restrictions for future development because of narrow streets.  Plaintiffs did not provide the list from the Berkeley Fire Department, however, or demonstrate the proposed dwellings present unique fire or access risks. Plaintiffs have failed to demonstrate the City's nondetriment findings were insufficient or unsupported by substantial evidence.

### III.  DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.

_____
Margulies, Acting P. J.

We concur:


_____
Banke, J.



_____
Kelly, J.[*]




A153942
*Berkeley Hills Watershed Coalition v. City of Berkeley*


---

[*] Judge of the Superior Court of the City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


24

Trial Court:   Alameda County Superior Court

Trial Judge:   Hon. Frank Roesch

Counsel:

Law Offices of Thomas N. Lippe and Thomas N. Lippe for Plaintiffs and Appellants.

Farimah F. Brown, City Attorney, Savith Iyengar and Jerome Mayer-Cantu, Deputy City Attorneys for Defendants and Respondents.

The Aftergood Law Firm and Aaron D. Aftergood for Real Parties in Interest and Respondents.